John CARLO, Appellant,

v.

UNITED STATES of America, Appellee.

No. 248, Docket 26499.

United States Court of Appeals Second Circuit.

Argued Jan. 20, 1961.

Decided Feb. 9, 1961.

George J. Todaro, New York City, for appellant.

Paul J. Curran, Asst. U. S. Atty., New York City (S. Hazard Gillespie, Jr., U. S. Atty., for Southern District of New York, David Klingsberg, Jonathan L. Rosner and Arthur I. Rosett, Asst. U. S. Attys., New York City, on the brief), for appellee.

Before LUMBARD, Chief Judge, and MEDINA and SMITH, Circuit Judges.

MEDINA, *Circuit Judge.*

On May 24, 1960 certain agents of the Bureau of Narcotics of the United States Treasury Department entered John Carlo's Apartment Number 8 at 313 East 118th Street, New York City, and seized a brown paper bag containing six glassine envelopes within which were six ounces of heroin and two cardboard boxes containing 1¼ kilos of heroin. With the narcotics in one of the cardboard boxes was $20,100 of United States currency in a tightly wrapped brown paper bag.

After the arrest and arraignment of John Carlo on a charge of violation of the Narcotics Laws, but before his indictment, he initiated this proceeding to suppress the evidence thus seized and to compel the return of the property to him on the ground that there had been an unreasonable search and seizure in violation of his constitutional rights under the Fourth Amendment. After a hearing at which witnesses for the respective parties testified to contradictory versions of the attendant circumstances, Judge Murphy reviewed the testimony and held, "we accept the government agents' testimony and reject the testimony of petitioner, his brother, Joseph DiCarlo, his wife, Matilda Carlo, and his daughter, Mildred." The petition was denied and John Carlo appeals.

The agents entered the Carlo apartment at about 7:15 P.M.; they had no warrant either for the arrest of any person or for the search of the premises. As we are concerned here with one of the most fundamental and significant of the provisions of the Bill of Rights, we must scrutinize the evidence with meticulous care to make sure that no determination made by us in this case shall constitute any watering down or erosion of the rights guaranteed by the Fourth Amendment.

On the basis of the testimony by Agents Gabriel Dukas and James M. Burke, and disregarding the testimony of appellant and his witnesses as not credible, as did Judge Murphy, we shall now state the facts in chronological sequence. We are concerned with the following persons: Robert Brown, an "undercover agent" of the Bureau of Narcotics, Anna Paul Davenport, an alleged distributor of narcotics in small lots, arrested on May 24, 1960, charged with violation of the Narcotics Laws, Matilda Carlo, arrested on May 24, 1960, charged with violation of the Narcotics Laws, Joseph DiCarlo, brother of appellant, arrested on May 24, 1960, charged with violation of the Narcotics Laws, and appellant John Carlo, the husband of Matilda, the lessee of Apartment Number 8 at 313 East 118th Street, and the last of the group to be arrested on May 24, 1960, charged with violation of the Narcotics Laws.

The first contact any of the government agents had with any of the persons arrested on May 24, 1960 was some sort of a narcotics transaction between Matilda Carlo, Davenport and Brown on February 1, 1960. The agents had never seen Matilda before, they did not know who she was or where she lived. She was followed, but apparently to no purpose as the agents did not ascertain her place of residence. She was not kept under surveillance and she was seen again by the agents on May 24, 1960.

Joseph DiCarlo comes into the picture on February 17, 1960. On that day Brown and Davenport arrived by automobile at 125th Street and Park Avenue, New York City, about 12:20 P.M. After parking the car, Davenport got out and after some walking around met the man who later turned out to be Joseph DiCarlo. As agent Dukas had them under observation, he saw Davenport give DiCarlo "a small brown paper bag," and DiCarlo handed "her another brown paper bag that he carried under his arm." Davenport sold the contents of the brown paper bag to Brown, and it was later ascertained that the bag contained narcotics. None of the agents at that time knew the identity of DiCarlo. Dukas followed him and saw him enter the building at 313 East 118th Street. It was not until May 24, 1960, that the government agents knew that Apartment Number 8 was of interest to them, or that the woman who turned out to be Matilda Carlo lived in that apartment.

Things came to a head on May 24, 1960. At about 1 P.M. Davenport and Brown appeared in an automobile at 173rd Street and Third Avenue in the Bronx. At this point Davenport got out of the car and started walking down the street; she met Matilda Carlo, whose identity will shortly become known to the agents, and Matilda Carlo handed Davenport a shoe bag. Dukas, who had the pair under observation, waited until Matilda Carlo had passed out of sight, and he then arrested Davenport, searched her purse, found that in the shoe bag were eight glassine envelopes containing a white powder that turned out to be heroin. Dukas questioned Davenport about the February 17th, 1960 transaction, and he testified she replied, "a person she knew as Sonny and also as Joe was the person who delivered the narcotics to her at that time on the 17th."

It does not appear that any of the agents followed Matilda Carlo after she delivered the heroin to Davenport on May 24, 1960; but, after the arrest of Davenport, Dukas obtained certain information about an automobile license number and a telephone number. He telephoned these in to the central office, some checking was done, and at about 3 P.M. the Narcotics Bureau informed agent

Burke by radio in his car that her address was 313 East 118th Street. There is nothing in the testimony of the agents to indicate when Matilda Carlo returned to her home that afternoon. She left 313 East 118th Street, however, at about 7 P.M. Agent Dukas saw her come out and after a few minutes he saw the same person he had observed giving the small brown bag to Davenport on February 17, 1960 go into the apartment house, 313 East 118th Street. This person turned out to be Joseph DiCarlo. Dukas followed him into the building, up one flight of stairs, and saw him enter Apartment Number 8 on the second floor. This appears to be the first time any of the government agents saw anyone suspected of having dealings in narcotics go into this particular apartment in 313 East 118th Street. All they knew on February 17, 1960 was that DiCarlo was seen entering the building at that address.

In the meantime, agent Burke followed Matilda Carlo, with her young son and her bundle of clothes to the Laundromat nearby. In the Laundromat Burke arrested Matilda because of the narcotics transaction she had that same afternoon with Davenport, as above described. Burke searched Matilda Carlo but found no narcotics either in the laundry bag or in her purse. As Burke and agents Cockrill and Dugan were about to take Matilda Carlo and the little boy down to headquarters, she asked to be allowed to return to her home to leave the child. Dukas was waiting somewhere above the landing on the second floor, having seen DiCarlo enter Apartment Number 8 a few minutes before, while Matilda Carlo was on her way to the Laundromat.

When Matilda Carlo and her child, together with Burke and the other officers arrived at 313 East 118th Street, she led them to Apartment Number 8, opened the door, without using a key, and she entered the apartment, followed by Dukas and Burke, who went up the hall of the apartment to the kitchen, where they saw the two brothers, Joseph DiCarlo and John Carlo sitting at a table drinking a can of beer.

Agent Burke immediately placed DiCarlo under arrest. Up to this moment there is no reason, on the record before us, to suppose that the agents even knew of the existence of John Carlo or had any reason to suspect that he had committed any crime.

In the kitchen was a washing machine, and, after the arrest of DiCarlo, agent Dukas observed a small brown paper bag in plain sight, on top of the washing machine. On the oral argument of the appeal we were inclined to think the small brown paper bag was lying on its side open, so that, without taking possession of the bag and looking inside, its contents could be seen, as Judge Murphy's opinion states: "At the time they saw a number of glassine envelopes containing white powder on a washing machine in the kitchen and asked who owned them." · But no such specific testimony was given by either Dukas or Burke, and we must take the fact to be that Dukas saw the small brown paper bag, picked it up, looked inside and saw the six glassine envelopes and the white powder that later proved to be six ounces of heroin.

At this point there was the following colloquy between John Carlo and Dukas:

"Carlo: What is this all about?

"Dukas: Your wife is under arrest for violation of the federal narcotics laws.

"Carlo: You can't take her, this is not hers, that is mine.

"Dukas: Do you know what you are talking about?

"Carlo: Yes.

"Dukas: If you admit this is yours I will have to arrest you.

"Carlo: I told you that is mine."

Thereupon Dukas placed John Carlo under arrest. When inquiry was made as to the whereabouts of "the rest," and after a statement by Dukas that Mrs. Carlo would not be arrested on account of the glassine envelopes with white powder found in the small brown paper bag on the washing machine, John Carlo went with agents Burke and Cockrill into the

bedroom and pointed out two boxes on the bureau which were seized by the agents and found to contain 1¼ kilos of heroin. The next day it was discovered that in "amongst the narcotics" found in one of the boxes was $20,100 in United States currency "in a tightly wrapped brown paper bag."

■ We think the critical issue is whether it was proper for Dukas to take possession of the brown paper bag on the washing machine and open it to examine its contents.

While the entrance to the apartment was effected by Matilda Carlo as her own voluntary act, and there was at no time any noise or disturbance or the use of any force, it seems clear to us that the search and seizure here can be justified only on the ground that it is incidental to a lawful arrest. There was no warrant to search the apartment.

The controlling statute is the following part of the Narcotics Control Act of 1956, 26 U.S.C. § 7607:

"*Section 7607. Additional authority for bureau of narcotics and bureau of customs.*

"The Commissioner, Deputy Commissioner, Assistant to the Commissioner, and agents, of the Bureau of Narcotics of the Department of the Treasury, and officers of the customs (as defined in section 401(1) of the Tariff Act of 1930, as amended; 19 U.S.C., sec. 1401(1)), may—

\* \* \* \* \* \*

"(2) make arrests without warrant for violations of any law of the United States relating to narcotic drugs (as defined in section 4731) or marihuana (as defined in section 4761) where the violation is committed in the presence of the person making the arrest or where such person has reasonable grounds to believe that the person to be arrested has committed or is committing such violation."

That it was proper for the Congress to confer such authority upon agents of the Bureau of Narcotics has been held in

Draper v. United States, 1959, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327, and it was also settled by Draper (358 U.S. at page 310, 79 S.Ct. at page 331) that the words "reasonable grounds to believe" are equivalent to the phrase "probable cause" in the Fourth Amendment.

Thus the first question we must answer is, was the arrest of Joseph DiCarlo without a warrant a lawful arrest. We think the answer is clearly, yes. We cannot doubt there was probable cause to arrest DiCarlo. Agent Dukas saw him deliver the small brown paper bag to Davenport on February 17, 1960; the information derived from undercover agent Brown induced Dukas to believe that Davenport delivered the same small brown paper bag to him, and it was found to contain narcotics. When Dukas saw this same man, who he had reason to believe had delivered narcotics to Davenport, go upstairs and enter Apartment Number 8 in 313 East 118th Street on May 24, 1960, he recognized him; and after Dukas had passed this information along to Burke, and as soon as Mrs. Carlo opened the door and let the agents go into this apartment, the man was placed under arrest and he turned out to be Joseph DiCarlo, the brother of John Carlo whose apartment they were in. There is no proof that the agents had DiCarlo under surveillance in the interval between February 17, 1960 and May 24, 1960. Nor could the lapse of the intervening period of time have so dimmed the recollection of Dukas as to transform "reasonable grounds to believe" on February 17, 1960 that DiCarlo had committed a crime, into something short of such "reasonable grounds to believe" on May 24, 1960, especially as what Dukas observed was in the course of his official duty. While Dukas did not know at the time he witnessed the occurrence on February 17, 1960 that the small brown paper bag contained narcotics, he certainly suspected this to be so, and he was informed thereafter that it did contain narcotics. In effect, the crime was committed on February 17, 1960 in the very presence of Dukas; and it was Dukas who, at the

hearing before Judge Murphy, testified to what he saw. We hold the arrest of DiCarlo to have been lawful, despite the delay and despite the absence of a warrant. See United States v. Garnes, 2 Cir., 1958, 258 F.2d 530, certiorari denied, 1959, 359 U.S. 937, 79 S.Ct. 651, 3 L.Ed. 2d 637; United States v. Volkell, 2 Cir., 251 F.2d 333, certiorari denied, 1958, 356 U.S. 962, 78 S.Ct. 1000, 2 L.Ed.2d 1068; United States v. Perez, 2 Cir., 242 F.2d 867, certiorari denied, 1957, 354 U.S. 941, 77 S.Ct. 1405, 1 L.Ed.2d 1539.

 Delay by law enforcement officers in arresting a suspect does not ordinarily affect the legality of the arrest. Here the delay was three months, and we have no reason to suppose the arrest could have been made sooner than it was made. In DiBella v. United States, 284 F.2d 897, 907, decided by this Court on November 23, 1960, Judge Waterman states in his dissenting opinion that Di-Bella had "been under surveillance for seven months" before his arrest and after the alleged commission of the crime for which he was arrested. Law enforcement officers have a right to wait in the hope that they may strengthen their case by ferreting out further evidence or discovering and identifying confederates and collaborators. But every time there is delay in the making of the arrest and there is a search made as incidental to the arrest, the law enforcement officers take the risk that they will be charged with using the arrest as a mere pretext for the search. See United States v. Lefkowitz, 1932, 285 U.S. 452, 467, 52 S.Ct. 420, 76 L.Ed. 877; Henderson v. United States, 4 Cir., 1926, 12 F.2d 528, 51 A.L. R. 420; Worthington v. United States, 6 Cir., 1948, 166 F.2d 557, 566; Clifton v. United States, 4 Cir., 1955, 224 F.2d 329, 330; United States v. McCunn, D.C. S.D.N.Y., 1930, 40 F.2d 295, 296; United States v. Chodak, D.C.D.Md.1946, 68 F. Supp. 455. In other words, the delay in making the arrest is one of the factors to be taken into consideration when the time comes for a judicial determination of the question of whether or not the search was "reasonable." The mere fact that the arrest was not unlawful does not give law enforcement officers carte blanche to rummage about at will in any home or other place where an arrest is made and then seek to justify their conduct by a blanket statement that the "search" made by them was incidental to an arrest. All the attendant circumstances, including the delay in making the arrest and the reasons for such delay must be taken into consideration.

 Was it lawful to take possession of the small brown paper bag on the washing machine in John Carlo's apartment on May 24, 1960 as incidental to the arrest of Joseph DiCarlo? This is a closer question, because this is not the apartment of DiCarlo. Moreover, our determination of the issues here must not be affected by the fact that the small brown paper bag actually did contain heroin, nor by the fact that John Carlo later revealed the huge quantity of heroin found in the bedroom. Byers v. United States, 1927, 273 U.S. 28, 29, 47 S.Ct. 248, 71 L.Ed. 520; United States v. Di Re, 1948, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210; Johnson v. United States, 1948, 333 U.S. 10, 16–17, 68 S.Ct. 367, 92 L.Ed. 436. The search "is good or bad when it starts." United States v. Di Re, supra, 332 U.S. at page 595, 68 S.Ct. at page 229. Indeed, we may go so far as to say that the fact that traffic in narcotics is such a despicable crime makes it all the more necessary to be scrupulously careful to protect constitutional and other rights in such cases.

At least it is clear that there was no time to obtain a search warrant. It was not even known by the agents that the Carlos lived in Apartment Number 8 until a very short time before the arrest of DiCarlo. And the presence of the small brown paper bag containing the six glassine envelopes filled with heroin was observed to be on the washing machine just a moment or two after the arrest of Di-Carlo. The agents may have suspected that the source of supply from which Di-Carlo and Matilda Carlo obtained the narcotics delivered to Davenport was somewhere in the neighborhood, but this

provided no basis for an application for a warrant to search the Carlo apartment.

In all the leading cases emphasis is placed upon the necessity for prompt and speedy action. This is always a matter of concern. Here we are dealing with a type of property that, at a moment's notice and the merest suspicion that government agents are on the scent, can be flushed down a toilet.[1] If the contents of that small brown paper bag were ever to be known to the government, it was absolutely necessary for Dukas to take the bag into his immediate possession.

On the subject of control, it is true that the apartment was in the general control of the Carlos who lived there with their children, but the washing machine was in the immediate vicinity of DiCarlo as he sat at the kitchen table drinking beer with his brother. If the small brown paper bag lying on top of the washing machine belonged to DiCarlo as Dukas had good reason to believe might be the case, DiCarlo was so near to it as to have this particular object within his control.

With all the particular attendant circumstances of this case in mind, what is the test or the principle to be applied in order to reach a reasoned conclusion concerning the legality of the action by Dukas in picking up the small brown paper bag from the top of the washing machine and in examining its contents? We think the principle in all cases of this type is the same: under all the circumstances the search must be reasonable, viewed against the background and purpose of the Fourth Amendment. United States v. Rabinowitz, 1950, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653. It is clear that the arrest of DiCarlo would not have justified a general exploratory search of the entire Carlo apartment. See Go-Bart Importing Co. v. United States, 1931, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374;

United States v. Lefkowitz, supra. On the other hand, the fact that it was not DiCarlo's apartment is not an absolute obstacle to any search whatever. Clifton v. United States, supra.

We think it reasonable to conclude that, as incidental to his arrest, it was proper at least to search DiCarlo's person and also to examine anything near DiCarlo and in plain sight in the Carlo kitchen that was apparently relevant to DiCarlo's alleged traffic in narcotics, such as narcotics or implements connected with the use of narcotics. Surely no one with knowledge of the dealings between DiCarlo and Davenport, as disclosed in this record, could fail to think there was probable cause to believe that the contents of this particular small brown paper bag were the same as the contents of the other small brown paper bag that was delivered by DiCarlo to Davenport on February 17, 1960, and that the bag and its contents were or might prove to be the property of DiCarlo, or in his possession or control. He might well have placed the bag on the washing machine, just as he would put down his hat, to await the time of his departure from the apartment. Had the bag been lying on its side open, with the six glassine envelopes containing white powder in plain view, as we first supposed to be the case, would any sensible person say that it would be unreasonable for the officers to pick up the bag and its contents and that the officers must go away with DiCarlo and leave the narcotics lying on the top of the washing machine? And yet Dukas had almost as much reason to suppose narcotics were in the closed brown paper bag as he would have had if the glassine envelopes had been exposed. The courts have uniformly sustained the right to seize visible instruments or fruits of crime at the scene of the arrest. See Marron v. United States, 1927, 275

---

1. "Narcotic drugs are small in volume and high in price. A fortune in drugs can be concealed under clothing and can be destroyed or moved to a place of safety on a moment's notice." Illicit Traffic in Narcotics, Barbiturates, and Amphetamines in the United States; Report to the House Committee on Ways and Means From the Subcommittee on Narcotics, printed in H.R.Rep. No. 2388, pp. 51, 62, 1956, 84th Cong., 2d Sess.

U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 as explained in Go-Bart Importing Co. v. United States, supra, 282 U.S. at page 358, 51 S.Ct. at page 158, and United States v. Lefkowitz, supra, 285 U.S. at page 465, 52 S.Ct. at page 423.

In thus deciding the principal issue of reasonableness we think we adhere to the fundamentals implicit in the historical traditions embedded in the Fourth Amendment, and even in accord with what was written by Mr. Justice Frankfurter in his stirring dissent in United States v. Rabinowitz, supra, for therein he states, at page 72 *et passim*, of 339 U.S., at page 438 of 70 S.Ct.: "From this it follows that officers may search and seize not only the things physically on the person arrested, but those within his immediate physical control."

■ One of the arguments advanced by appellant for the reversal of Judge Murphy's order is that there is no competent evidence that the bag delivered by Davenport to Brown on February 17, 1960 and found to contain heroin was the same bag that Dukas saw DiCarlo deliver to Davenport on that day. It is clear that Dukas had reason to believe it was the same bag, and that is enough. It was not necessary to produce Brown at the hearing to give firsthand testimony. It is well settled that the quantum of proof to be adduced on a summary proceeding to suppress evidence is not that required on a trial of the issue of guilt or innocence of a violation of the Narcotics Laws or other criminal statutes. Brinegar v. United States, 1949, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879; Draper v. United States, supra; Henry v. United States, 1959, 361 U.S. 98, 102, 80 S.Ct. 168, 4 L.Ed.2d 134.

We are constrained to hold that the seizure of the small brown paper bag and the examination and retention of its contents by the agents were lawful and proper, as held by Judge Murphy. When the bag was found to contain the six glassine envelopes full of a white powder, and John Carlo admitted they belonged to him, there was probable cause to arrest John Carlo, and, as incidental to this arrest, to search the apartment for narcotics, even if he had not volunteered to show the agents where "the rest" of the narcotics was to be found. Accordingly, it is not necessary for us to consider the question, whether or not the search of the small brown paper bag, or any further search of the apartment, was proper as incidental to the arrest of Matilda Carlo. But see Agnello v. United States, 1925, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145.

We find that none of the arrests was a mere pretense for the making of a search of the Carlo apartment. Moreover, there is no merit in appellant's contention that Judge Murphy's findings on the subject of the credibility of the witnesses who testified at the hearing before him should be set aside as clearly erroneous, or for any other reason.

■ How about the currency? On May 27, 1960 the Commissioner of Internal Revenue, acting under the authority of 26 U.S.C. §§ 6851 and 6861, declared appellant's taxable year to be terminated as of May 24, 1960 and made a jeopardy assessment against appellant and his wife in the amount of $54,240, notice of which was served on the wife on the same date. Also on May 27, 1960, and prior to the commencement of this proceeding, the assessment was filed as a lien with the Register of the City of New York, as authorized by 26 U.S.C. §§ 6321–6323, and Notice of Levy and Demand, pursuant to 26 U.S.C. Section 6331, was served on George H. Gaffney, District Supervisor of the Federal Bureau of Narcotics, who then had custody of the seized $20,100.00. Also on May 27, 1960, pursuant to this Notice of Levy and Demand, Gaffney delivered the money to an officer of the Internal Revenue Service, and thereafter it was deposited in the Treasury of the United States to be applied to the taxes assessed as due and owing by appellant on May 24, 1960. Apparently, through a misunderstanding of these facts, and especially the delivery of the money to an officer of the Internal Revenue Service prior to the commencement of this proceeding, Judge Murphy

at first granted so much of appellant's petition as demanded the return of the money. Later the order was resettled and the petition denied in its entirety.

As the currency was found tightly wrapped in another one of these brown paper bags and in the cardboard box with a quantity of the seized heroin, it may well be that return of this money should have been refused in any event because these facts justified an inference that the money as well as the heroin was used in the illegal traffic in narcotics. But we need not go so far as to decide that it was so used, as it was not error for Judge Murphy to refuse to order the return of the money under Rule 41(e) of the Federal Rules of Criminal Procedure, 18 U.S.C., as it was not only "subject to lawful detention" because of the tax lien, but it had already been paid into the Treasury of the United States. See Welsh v. United States, 1955, 95 U.S. App.D.C. 93, 220 F.2d 200; Field v. United States, 5 Cir., 263 F.2d 758, certiorari denied, 1959, 360 U.S. 918, 79 S.Ct. 1436, 3 L.Ed.2d 1534; Simpson v. Thomas, 4 Cir., 1959, 271 F.2d 450. We thus leave it open to appellant, if he chooses to do so, to pursue such other remedies as may be available to him for the determination of his claim against the United States for $20,100.

Affirmed.

SMITH, Circuit Judge (concurring).

I concur in the result.

While reliance solely on the February 17 transaction may be open to question, at the time of DiCarlo's arrest on May 24 sufficient grounds existed for a reasonable belief on the part of the agents that he was then engaged in a violation of the narcotics law.

In view of the earlier delivery of narcotics in a brown paper bag by DiCarlo to Davenport on February 17, the movements of DiCarlo to the apartment on February 17 and May 24 and Matilda Carlo on May 24, Matilda's then delivery of narcotics to Davenport, and the presence of the brown paper bag with DiCarlo in the kitchen, the agents had reasonable cause to believe that DiCarlo was engaged on May 24 in narcotics transactions and his arrest without warrant at that time may be justified and the searches and seizures upheld. There is of course, no issue here as to the legality of entry in the apartment.

It is not necessary to determine here, however, that the arrest may be justified as of one "who has committed such violation" solely by the knowledge of the February 17th transaction. Such a justification may be questionable in view of the failure, so far as the record discloses, to make any effort to obtain and serve a warrant in the period between February 17 and May 24. There was plenty of time to obtain a warrant of arrest in the more than three months intervening. While the language of the statute and the legislative history are not specific as to the time within which the stated officers are to act, arrest without warrant may well have been authorized by the Congress primarily in order to permit prompt action in a situation where abandonment of surveillance and delay while obtaining a warrant might cause escape or destruction of evidence. Even a warrant, obtained in obedience to the Constitutional requirements for warrants of arrest should be executed with reasonable promptness or it may become stale. United States v. Joines, 3 Cir., 1958, 258 F.2d 471, Seymour v. United States, 85 U.S.App.D.C. 366, 177 F.2d 732. An exception by necessity carved out of the Constitutional requirement should not be allowed greater breadth. However, if the agents were reasonably justified in a belief that at the time of the arrest on May 24 or within a reasonable time prior thereto DiCarlo was engaged in a narcotics transaction, the arrest and the subsequent search of the bag must be held valid under the statute. Here the agents were reasonably justified in such a belief that DiCarlo was on May 24 so engaged. The search of the brown paper bag was therefore reasonable, as was the following arrest of Carlo on his admission of ownership, and the further search thereafter authorized by Carlo.