**UNITED STATES of America**

v.

**Antonia FIGUEROA, Frank Figueroa, and Edmond Figueroa, Defendants.**

United States District Court
S. D. New York.
April 25, 1962.

Robert M. Morgenthau, U. S. Atty. for Southern District of New York, New York City, Ned D. Frank, Asst. U. S. Atty., of counsel, for United States.

Mark T. Smith, New York City, for defendant, Edmond Figueroa.

CASHIN, District Judge.

Defendant, Edmond Figueroa, has moved for a bill of particulars pursuant to Rule 7(f) of the Federal Rules of Criminal Procedure, 18 U.S.C.A. and for an order pursuant to Rule 41(e) of the Federal Rules of Criminal Procedure suppressing certain evidence allegedly seized as a result of an unlawful search and seizure.

The facts are briefly as follows: In February 1961 undercover Agent Mangiaracina of the Federal Bureau of Narcotics was introduced by a special employee to Antonia and Frank Figueroa, codefendants. On February 21, 1961, this undercover agent purchased one ounce of heroin from Antonia Figueroa, who is no relation to the movant. Immediately before and after the sale she was observed entering 5–7 East 107th Street, Manhattan, New York. On February 28, 1961, the same agent, Anthony Mangiaracina, made a second one-ounce purchase. At this time Antonia Figueroa was again observed entering the same building before and after the sale and was also seen entering apartment 5 of this building by Agent Carrozo.

The narcotic agents had been originally "tipped off" about Antonia Figueroa by a special employee, Pete Woods. This Pete Woods had supplied information to Agent Ferro for a period of several years and all of the information received from him in the past had been found to be reliable. After the sale on February 28, 1961, the agents again communicated with this special employee to try and determine Antonia Figueroa's source of supply. Agent Ferro testified that the special employee told him that on one occasion he, the special employee, was able to observe Frank Figueroa, a codefendant, making a telephone call to his connection and he was able to obtain the first two digits of that number. The first digit was 3 and the second digit was 4. Agent Ferro then checked the telephone numbers listed to 5–7 East 107th Street and found that only two telephone numbers in this building could use the combination of the digits 3 and 4. One of these telephone numbers was listed to a Mrs. Rose Benitez in apartment number 5. The special employee had also informed Agent Ferro that the connection's nickname was "Moe" or "Elmo". After checking the files in his office, Agent Ferro determined Mrs. Rose Benitez was an aunt of defendant Edmond Figueroa and that his address was listed in a 1944 memorandum as 5–7 East 107th Street. Agent Ferro also obtained a photograph of Edmond Figueroa and ascertained that he had the nicknames of "Moe" and "Elmo". From the photograph, Agent Ferro remembered that he had seen defendant Edmond Figueroa in the vicinity of 107th Street and Madison Avenue hailing a taxicab at the conclusion of the purchase on February 28, 1961.

Arrangements were then made by the various agents connected with the case for Agent Mangiaracina to place an order for two ounces of heroin and to purchase only one, thus leaving one ounce with the connection. On March 29, 1961, this third sale was consummated. Sometime after 6:30 P.M. Antonia Figueroa was again observed entering and leaving 5–7 East 107th Street. She delivered one ounce of narcotics to Agent Mangiaracina and informed the agent that if he still wanted to buy the other ounce that her connection had the ounce in his apartment. This took place around 7:15 P.M. and shortly after that Antonia Figueroa was arrested in the vicinity of 107th Street and Madison Avenue. At this time she had $400, which had been given to her by Agent Mangiaracina, in her possession. After the arrest, Agents Carrozo and Ferro proceeded to and entered 5–7 East 107th Street. After waiting on the first floor landing for approximately one-half hour until 8:30 P.M., the agents saw a woman, who they later determined to be Mrs. Rose Benitez, place a key into the door of apartment 5 and open it. Agent Ferro testified that "At this point Agent Carrozo and I approached her and told her that we were federal officers and at this point she said, 'Please'. We then entered the apartment.

The apartment was dark except for some light coming out from under a door from a room on the left. Agent Carrozo knocked on the door and said that we were federal officers, 'Open the door'. At this time we heard a scuffle in the room and we proceeded to push the door in." There were two men in the room, one of whom was the defendant, Edmond Figueroa, who was placed under arrest. The room was then searched for a little more than an hour and a small double glassine envelope containing 200 milligrams of cocaine and a large glassine envelope containing 38 grams of heroin were uncovered.

Agent Carrozo's testimony differs slightly from that of his fellow-agent Ferro's. Agent Carrozo testified that as Mrs. Rose Benitez opened the door, " * * * Agent Ferro and I came off the stairwell and I identified myself. I told her we were federal officers. She stuck her head in the door and called down the hallway 'Police'. I pushed by her. The apartment was completely dark, except, I believe it was the third room on the left, I could see light from underneath the door. I tried the door and it was locked. I asked Mrs. Benitez what was in there. She said, 'Nothing'. I could hear some scuffling. I said, 'Federal officers. Open the door'. Nobody opened the door, so I knocked it down, and as I entered the room I placed Edmond Figueroa under arrest and proceeded to search the room."

According to the testimony of Mrs. Rose Benitez, the agents just pushed by her without identifying themselves and proceeded to kick in the door to a room in the apartment.

When the agents entered the room and arrested Edmond Figueroa that was the first time they had even seen him except for the time that Agent Ferro recalled seeing him hail a taxi. The only things, before his arrest and the subsequent search, that connected Edmond Figueroa with Antonia Figueroa were the information from the special employee as to the telephone number, the 1944 memo-randum listing Ermond Figueroa's address at that time as 5–7 East 107th Street and the similarity of the nicknames. It must also be remembered that, although she didn't identify him, Antonia Figueroa had stated that her connection had another ounce of heroin in his apartment.

The questions presented by this motion are:

1. Did the Government agents have probable cause to arrest Edmond Figueroa on March 29, 1961?; and

2. If there was probable cause to arrest him, did the delay in arresting the defendant affect the legality of the arrest?

I find that there was probable cause to arrest the defendant without a warrant on March 29, 1961 and that the delay in arresting him did not affect the legality of that arrest. Therefore, defendant's motion must be denied.

26 U.S.C. § 7607 states that agents of the Bureau of Narcotics, among others, may:

"(2) make arrests without warrant for violations of any law of the United States relating to narcotic drugs (as defined in section 4731) or marihuana (as defined in section 4761) where the violation is committed in the presence of the person making the arrest or where such person has reasonable grounds to believe that the person to be arrested has committed or is committing such violation."

In the present case, the agents had the information of the informer that Antonia's source of supply used the nickname "Moe" or "Elmo" and the first two digits of his telephone number which was subsequently traced to apartment 5 of 5–7 East 107th Street. They also knew from their own records that Edmond Figueroa used the name "Moe" or "Elmo" and that he lived, at least in 1944, at 5–7 East 107th Street. They also had the knowledge that Antonia's source of supply was in apartment 5 of

5-7 East 107th Street. From this evidence I find that Agents Carrozo and Ferro had reasonable grounds to believe Edmond Figueroa had committed and was committing a violation of the narcotics law and his arrest was a lawful one. Costello v. United States, 298 F.2d 99 (9 Cir. 1962).

I also find that the delay in arresting the defendant did not affect the legality of his arrest. At most, the delay was one month. In United States v. Di Bella, 178 F.Supp. 5 (E.D.N.Y.1959), aff'd. 284 F.2d 897 (2 Cir. 1960) the delay was seven months. In Carlo v. United States, 286 F.2d 841 (2 Cir. 1961) it was stated that:

> "Delay by law enforcement officers in arresting a suspect does not ordinarily affect the legality of the arrest. Here the delay was three months, * * *. Law enforcement officers have a right to wait in the hope that they may strengthen their case by ferreting out further evidence or discovering and identifying confederates and collaborators."

Thus, since Edmond Figueroa's arrest was lawful, a reasonable search of his premises was proper. United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950).

Defendant's motion to suppress is, therefore, denied.

As regards defendant's motion for a bill of particulars, the Government has consented to furnish the approximate date and time of the act charged in the Fourth Count of the Indictment as requested in item one of defendant's moving papers. Defendant's request for the date on which the Government claims the defendant entered into the alleged conspiracy is denied.

Defendant's motion to suppress is denied and his motion for a bill of particulars is denied except to the extent that the Government has consented to it.

It is so ordered.