STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v.
LᴇROY MILLER, DEFENDANT-RESPONDENT.

Argued March 22, 1966—Decided June 6, 1966.

*Mr. Barry H. Evenchick,* Assistant Prosecutor of Essex County argued the cause for appellant (*Mr. Brendan T. Byrne,* Prosecutor of Essex County, attorney; *Mr. John G. Graham,* Assistant Prosecutor of Essex County, on the brief).

*Mr. Philip I. Levilan* argued the cause for respondent.

The opinion of the court was delivered by

SCHETTINO, J. Defendant was indicted by the Grand Jury of Essex County for the possession of heroin, *N. J. S. A.* 24:18–4. Prior to trial, he moved before the Essex County Court for the suppression of certain evidence relating to the indictment. After formal hearing, the court granted defendant's motion and the State sought and was granted leave to appeal by the Appellate Division, which at the same

time, remanded the cause for the purpose of taking further testimony. From an adverse ruling after this second hearing, the State again sought and again was granted leave to appeal and we certified the cause prior to hearing in the Appellate Division.

From the record of the two hearings and from the findings of fact and conclusions of law filed by the county court after each hearing, it appears the search and seizure occurred in the following manner. On October 15, 1964 one Ronald Miller, a brother and co-tenant with defendant at an apartment located at 112 Broad Street, Newark, called the Newark Police Headquarters and claimed he had information concerning the whereabouts of one David "Skip" Bynum who was being sought in connection with a Newark robbery homicide involving the use of a gun and for whom there was an outstanding arrest warrant. Police Headquarters dispatched Detectives Carr and Pepe to the corner of Third Avenue and Broad Street to meet with the informant, Ronald Miller.

Upon their arrival, Ronald Miller told the detectives that Bynum was with his brother, the defendant in this case, in the Miller brothers' apartment. Ronald stated that he had just been released from the penitentiary and that as he knew Bynum was a fugitive and had his "piece" (gun) with him, he wanted Bynum out of the apartment so that he (Ronald) would not get involved and be returned to jail. Although he had never been used as an informer before, Ronald Miller was known to Detective Carr who was aware of the fact that Ronald had recently been released. The detectives knew of the outstanding arrest warrant for Bynum.

They proceeded immediately to the Miller apartment which was located in the basement of the building. Entering the building by a door which led into a common hallway, the officers drew their guns and knocked at the Miller apartment door. Upon inquiry as to their identity, Detective Carr answered by use of a fictitious name. As the defendant opened the door, the officers, with drawn guns, rushed past into the

apartment, and saw Bynum sitting at a table with a deck of cards. The officers arrested him immediately and, after handcuffing him, searched his person, as well as the person of the defendant for Bynum's gun but it was not found. A search of the premises followed. As Bynum was being handcuffed and searched, the defendant, Miller, was told to sit down. When he became excited, the officers tied his hands with a rope.

Detective Carr described the apartment in his testimony as a small single room area with the various portions of kitchen, bedroom and living room established by the positioning of particular furniture used in each. The front door opened into the living room which in turn opened into the kitchen with the bedroom to the rear; the total depth of the apartment being approximately 30 feet. The living area was 12 to 15 feet narrowing at the kitchen to approximately 8 feet and widening again to 12 to 15 feet in the bedroom area. Adjoining the bedroom area was a small bath.

The defendant disputes this description in respect to whether the rooms are portioned by the positioning of furniture. He states that there are walls, ceiling to floor. Even assuming the defendant is correct that the three rooms are portioned by walls, ceiling to floor, the trial court found and defendant admits that the kitchen area is visible to one standing in the living room and the bedroom area is visible to one standing in the kitchen. Thus, as the officers entered through the living room door, Bynum was readily visible while seated at the kitchen table.

Bynum was without his shoes and shirt. The officers, not finding the gun on the person of either the defendant or Bynum, proceeded to search the premises. Due to the fact that Bynum was not fully dressed and also to the fact that the informer, Ronald Miller, had indicated that Bynum was wearing a jacket when he arrived at the Miller apartment, Detective Carr initiated his search with a closet in the bedroom area, some 8 to 10 feet to the left rear of the table at which Bynum was sitting.

In the closet, which had no door but which was covered by a curtain, Detective Carr found a brown paper bag on the floor containing a hypodermic needle and other paraphernalia which usually are used by a narcotics user. Attached to the bag by a rubber band were 15 small glassine packets of heroin. Detective Carr testified that this heroin and the other narcotic paraphernalia were discovered some 10 to 15 minutes after the officers entered defendant's apartment.

A bed, located some 6 feet behind the chair where Bynum was sitting, was next searched. The officers testified that it was disheveled and upon it were lying various articles of men's clothing. As Detective Carr pulled back the covers, six more glassine envelopes of heroin fell to the floor. Bynum's gun was never found, although the remaining portions of the premises were subjected to a 20-minute unavailing search. Bynum and defendant were taken to police headquarters where defendant was charged with possession of narcotics in violation of *N. J. S. A.* 24:18–4.

Defendant contends and the trial court found the search of defendant's apartment and the seizure of the heroin and narcotics paraphernalia illegal because the officers although entitled to search incidental to the arrest of Bynum, could legally search and seize only in a limited perimeter of where Bynum was sitting when arrested. The court concluded that as Bynum was only a temporary guest or invitee, the officers were not entitled to search the "private" areas—the closet and bed—which were beyond "the area of Bynum's effective control." The court held further that the search and seizure could not be sustained under the theory that Bynum was possessed of a dangerous weapon which would allow the officers to search because of possible danger to themselves for it found that this information was obtained from an unknown and unreliable informer and thus insufficient to create "probable cause" and further that at the time the search was accomplished, the defendant and Bynum were tied and handcuffed and thus in no position to harm the officers or destroy the evidence.

We disagree with the conclusions of law and reverse the grant of defendant's motion to suppress.

■ Time and again we are faced with the contention that evidence obtained by search and seizure ought to be excluded by reason of some mechanical rule or technical concept excerpted from a judicial opinion without regard to the particular facts there involved or the context in which the alleged formulae were stated. *State v. Mark,* 46 *N. J.* 262, 275 (1966); *State v. Fioravanti,* 46 *N. J.* 109, 122 (1966), *certiorari* denied 384 *U. S.* 919, 86 *S. Ct.* 1365, 16 *L. Ed. 2d* 440 (1966); *State v. Bisaccia,* 45 *N. J.* 504, 516–517 (1965); *State v. Contursi,* 44 *N. J.* 422, 430 (1965); *State v. Bindhammer,* 44 *N. J.* 372, 380 (1965); *State v. Romeo,* 43 *N. J.* 188, 206 (1964); *State v. Doyle,* 42 *N. J.* 334, 343 (1964). As Mr. Chief Justice Weintraub pointed out in *Bisaccia,* (45 *N. J.,* at *p.* 517), the Fourth Amendment strikes a balance between the right of the individual to be secure in his home and person and the right of society to ferret out and cleanse itself of its criminal elements.

■ A court should measure the totality of the circumstances against the standard of "reasonableness" which is all that is required by the Constitution. Mr. Justice Hall described the judicial function in *State v. Contursi, supra,* 44 *N. J.,* at *pp.* 430–431:

"* * * It will be rare indeed if two cases are factually identical. The situation in a case to be decided must be judged by the factual complex in interrelated entirety. As Mr. Justice Frankfurter put it in his concurring opinion in *Chapman v. United States,* 365 *U. S.* 610, 618, 81 *S. Ct.* 776, 5 *L. Ed. 2d* 828, 834–835 (1961): '* * * whether or not a search is "unreasonable" turns on the circumstances presented by a particular situation, as a matter of substantive determination.' Few cases have simply a single element determinative of the prudence of the action taken. Consideration of the various factors separately, which is defendant's thesis here, may show no one in itself sufficient, but in combination the test may be met. Nor can the proofs be accuately appraised without regard to the nature of the believed crime involved and the recognized methods or devices of its commission. In all aspects, the common and specialized experience and work-a-day knowledge of policemen must be taken into account. *Cf. State v. Tanzola,* 83 *N. J. Super.* 40 (*App. Div.* 1964), certif.

denied 42 *N. J.* 419 (1964). Courts should always remember that arresting officers have to act on the spur of the moment and that they are not constitutional lawyers. *State v. Romeo, supra,* 43 *N. J.,* at *p.* 206. Judicial review must be 'in a commonsense and realistic fashion.' *United States v. Ventresca,* 380 *U. S.* 102, 85 *S. Ct.* 741, 746, 13 *L. Ed. 2d* 684, 689 (1965)."

It is true that a judicial opinion as to the reasonableness of a particular situation will refer to rule of thumb technical formulae which aid in the disposition of the case before it. But it is equally clear that when these formulae are sought to be applied to another situation "beyond the setting in which the subsidiary rule was devised," a court must view the application in terms of the test of reasonableness. *State v. Bisaccia,* 45 *N. J.,* at *p.* 516.

Just such a case is here presented where the defendant would have us apply these technical rules without regard to the reasonableness or unreasonableness of the total circumstances. The defendant initially contends that the officers here sought admission to his apartment upon information from an "unknown, unreliable and untested" informer and they therefore had no "probable cause" to believe the Miller apartment was being used for illegal activity and were not warranted in entering the apartment to search.

This contention fails not only because it fails factually but also because the rule it invokes is one without relevancy to the particular facts here. Although the trial court, here, found that the informer, Ronald Miller, was unknown and unreliable, it is clear from the record that he was not unknown in terms of anonymity, *State v. Scharfstein,* 79 *N. J. Super.* 236 (*App. Div.* 1963), affirmed 42 *N. J.* 354 (1964), for he identified himself to the officers and met with them and in point of fact was known by Detective Carr. Carr testified that he knew of Ronald Miller and knew that he had spent time in the penitentiary. Thus, although it can be said that Ronald Miller was unknown and unreliable in the sense that he was untested as an informer, it is certainly reasonable for police to find an informer's story credible and reliable

when they know that he was on parole, that such a person may suffer a return to jail when found consorting with known criminals and the informer tells them that a person being sought for a homicide under an arrest warrant is in his apartment with a deadly weapon. The rule of *Scharfstein* that a mere anonymous tip did not warrant a search of a person was formulated in a particular factual setting and has no bearing here where the informant's information is given in a face to face meeting with the officers and his information concerned the presence of a person sought for a crime carrying a deadly weapon in the informant's apartment. *Cf. State v. Contursi, supra.* See, *Draper v. United States,* 358 *U. S.* 307, 79 *S. Ct.* 329, 3 *L. Ed.* 2d 327 (1959); *Clifton v. United States,* 224 *F.* 2d 329 (4 *Cir.* 1955), *certiorari* denied 350 *U. S.* 894, 76 *S. Ct.* 152, 100 *L. Ed.* 786 (1955).

■ Defendant next contends that as the officers entered the apartment by means of a ruse—the use of a fictitious name upon inquiry from within—the illegality of the entry tainted the subsequent search and seizure. *Gouled v. United States,* 255 *U. S.* 298, 41 *S. Ct.* 261, 65 *L. Ed.* 647 (1921); *Jones v. United States,* 357 *U. S.* 493, 78 *S. Ct.* 1253, 2 *L. Ed.* 2d 1514 (1958); *Fraternal Order of Eagles No. 778, Johnstown, Pa. v. United States,* 57 *F.* 2d 93 (3 *Cir.* 1932). See, *Amos v. United States,* 255 *U. S.* 313, 41 *S. Ct.* 266, 65 *L. Ed.* 654 (1921). The short answer is that the co-tenant informer invited the police to go into his apartment to get rid of Bynum. In any event we find no merit in this argument.

In *Dickey v. United States,* 332 *F.* 2d 773 (9 *Cir.*), *certiorari* denied 379 *U. S.* 948, 85 *S. Ct.* 444, 13 *L. Ed.* 2d 545 (1964), government agents received information from an informer that the defendant was in a hotel room for the purpose of selling narcotics. Obtaining a pass key, the officers attempted to open the door when the defendant inquired as to who was at the door. Disguising his voice, one of the agents gave a fictitious name and the door was opened whereupon the defendant tossed a packet of narcotics to his wife. The court upheld the subsequent arrest and incidental

search holding that there was no "breaking" into the apartment and that entry by ruse was not illegal under *Leahy v. United States,* 272 *F. 2d.* 487 (9 *Cir.* 1959), *certiorari* dismissed 364 *U. S.* 945, 81 *S. Ct.* 465, 5 *L. Ed. 2d* 459 (1961) even though in *Dickey* the officers were not armed with an arrest or search warrant as were the officers in *Leahy.* See *Davis v. United States,* 327 *F. 2d* 301 (9 *Cir.* 1964). In *United States v. Locklear,* 237 *F. Supp.* 895 (*N. D. Calif.* 1965), the court, faced with a similar use of an assumed name to gain entry, pointed out that the *Gouled, Jones* and *Fraternal Order* cases stood for the proposition that entry by force or ruse for the purpose of performing a general search where, before entry, a proper search or arrest warrant could have been obtained was illegal. It then referred to many authorities holding that the fact that officers enter by force or ruse has no bearing on the legality of the subsequent search and seizure or arrest where the officers have a valid warrant or have "probable cause" that a crime has been or is being committed within the room.

The situation here presented is not unlike that which occurred in *State v. Fair,* 45 *N. J.* 77 (1965), where the police broke into an apartment to arrest a person who was suspected of a knife killing. They had knocked at the door and, hearing a scuffling from within, broke through the door. Mr. Justice Haneman reiterated the common law rule that officers may break into a dwelling for the purpose of making an arrest only upon demanding admission and explaining the purpose for which entry is demanded, *Ker v. State of California,* 374 *U. S.* 23, 83 *S. Ct.* 1623, 10 *L. Ed. 2d* 726 (1963); *State v. Smith,* 37 *N. J.* 481, 497–500 (1962); *State v. Doyle, supra.* "Compliance with the general mandate of such antecedent conduct is not required, however, where (1) immediate action is required to preserve evidence, *State v. Doyle, supra;* (2) the officer's peril would be increased, *People v. Maddox,* 46 *Cal. 2d* 301, 294 *P. 2d.* 6 (*Sup. Ct.* 1956), *cert.* denied 352 *U. S.* 858, 77 *S. Ct.* 81, 1 *L. Ed. 2d* 65 (1956); or (3) the arrest would be frustrated, *People v.*

*Maddox, supra."* 45 *N. J.* at *p.* 86. See, Blakley, "The Rule of Announcement and Unlawful Entry, Miller v. United States" and *Ker v. California,* 112 *U. Pa. L. Rev.* 499 (1964).

The procedure used here was well within the rule of *Fair.* The officers, pursuant to an arrest warrant for a suspect of a felony murder, had information that the suspect, armed with a deadly weapon, was within the apartment. It is clear that if required to identify themselves, demand their admission and explain their purpose, a distinct possibility or probability would arise that (1) Bynum would attempt to dispose of the "piece" or (2) take immediate steps in preparation for an attempted shooting of his way out or (3) do everything he could to get out of the apartment thus frustrating the arrest. Thus, use of a ruse after knocking at the door was clearly not an unreasonable course to take in such a situation.

█ Defendant does not dispute that evidence obtained from an otherwise legal search and seizure is not rendered inadmissible merely because it was discovered in a search for evidence of another crime. *State v. Mark, supra,* 46 *N. J.* 270; *Ellison v. United States,* 93 *U. S. App. D. C.* 1, 206 *F. 2d* 476 (1953). Rather, the defendant contends that upon the arrest of Bynum a valid search incident thereto is limited to an area over which Bynum exercised "effective control." Based upon the trial court's finding that Bynum was only an invitee or guest in Miller's apartment, defendant argues that Bynum exercised no "control" over any area other than where he was sitting and under *Harris v. United States, infra; United States v. Rabinowitz, infra* and *State v. Doyle, supra,* a search is rendered illegal when made in an area beyond the "control" of the person arrested. The State also argued the "control" issue, of course contending that the search of the closet some 8 to 10 feet from Bynum and the bed some 6 feet from Bynum were well within his "effective control."

The "immediate control" or "effective control" test as it is called was formulated in the case of *Harris v. United States,* 331 *U. S.* 145, 67 *S. Ct.* 1098, 91 *L. Ed.* 1399 (1947). There

defendant was arrested pursuant to valid arrest warrants for the crimes of mail fraud and intent to defraud banks by the transportation of forged checks in interstate commerce. Harris was arrested in the living room of a five-room apartment. In sustaining the search and seizure of draft cards in an envelope in a bedroom drawer, the court looked to the reasonableness of the entire situation finding such a search a permissible incident to a valid arrest to locate the fruits of the crime or the means by which it was committed and also because the possession by Harris of the draft cards was a crime being committed in the officers' presence. See *Carroll v. United States,* 267 *U. S.* 132, 45 *S. Ct.* 280, 69 *L. Ed.* 543 (1925) ; *Agnello v. United States,* 269 *U. S.* 20, 46 *S. Ct.* 4, 70 *L. Ed.* 145 (1925) ; *Boyd v. United States,* 116 *U. S.* 616, 6 *S. Ct.* 524, 29 *L. Ed.* 746 (1886). In answer to Harris' contention that the area of the search was too broad, the court stated :

"Nor can support be found for the suggestion that the search could not validly extend beyond the room in which petitioner was arrested. Petitioner was in exclusive possession of a four-room apartment. His control extended quite as much to the bedroom in which the draft cards were found as to the living room in which he was arrested. The canceled checks and other instrumentalities of the crimes charged in the warrants could easily have been concealed in any of the four rooms of the apartment. Other situations may arise in which the nature and size of the object sought or the lack of effective control over the premises on the part of the persons arrested may require that the searches be less extensive. But the area which reasonably may be subjected to search is not to be determined by the fortuitous circumstance that the arrest took place in the living room as contrasted to some other room of the apartment." 331 *U. S.,* at *p.* 152, 67 *S. Ct.,* at *p.* 1102, 91 *L. Ed.,* at *pp.* 1405–1406.

This control view was again formulated in *Rabinowitz* where defendant, again arrested subject to a valid arrest warrant, moved to suppress certain forged and altered postage stamps found in a search of defendant's one-room place of business in a desk drawer and in certain file cabinets. Rejecting defendant's claim that the search was too broad, the court held the room was small and under the immediate and complete

control of respondent. However, the opinion in *Rabinowitz* recognized that the language there employed had reference to the particular facts and circumstances and reiterated what we have said above concerning the Fourth Amendment's requirement of reasonableness. *United States v. Rabinowitz,* 339 *U. S.* 56, at *pp.* 63–64, 70 *S. Ct.* 430, at *p.* 434, 94 *L. Ed.* 653, at *p.* 659. Courts subsequent to *Harris* and *Rabinowitz* have made clear that the "control" language was intended as an outer limit of the areas of permissible search and have concentrated on the particular facts before them. See *Preston v. United States,* 376 *U. S.* 364, 84 *S. Ct.* 881, 11 *L. Ed. 2d* 777 (1964) ; *Stoner v. State of California,* 376 *U. S.* 483, 84 *S. Ct.* 889, 11 *L. Ed. 2d* 856 (1964) ; *Robinson v. United States,* 327 *F. 2d* 618 (8 *Cir.* 1964).

We had occasion to review the "control" contention in *State v. Doyle, supra.* In *Doyle,* defendants were arrested in a second floor apartment for the crime of abortion. We there held the police entitled to search the entire floor for evidence of the crime incidental to the arrest. Although Mr. Justice Francis reiterated the "control rule" as the outer limits of a valid search incident to an arrest, it is clear that the use of the term "control" referred to the fact that the apartment was small and that the Doyles were in possession of the entire area so that they had immediate access to all portions of the apartment for purposes of hiding or destroying incriminating evidence. *Carlo v. United States,* 286 *F. 2d* 841 (2 *Cir.*), *certiorari* denied 366 *U. S.* 944, 81 *S. Ct.* 1672, 6 *L. Ed. 2d* 855 (1961) ; *Clifton v. United States, supra.*

To apply the term "effective control" in this situation is not only to ignore the fact that the closet and the bed were only a few short feet from Bynum but also is to attempt to apply a property right concept to a situation in which the police officers had every reason to believe that a gun could be secreted by Bynum in places where he of course would have no property or possessory interest. To require the police to refrain from searching for a deadly weapon until the proprietal interests of the area are determined in a situation

such as here where the weapon could easily be disposed of is to strain common sense. Thus, the question in a case like the present is: Was it reasonable under the circumstances for the police to assume that the areas searched were reasonably accessible to Bynum for the purpose of hiding his gun?

The totality of the circumstances here present place the search and seizure beyond the ban of the Fourth Amendment. *United States v. Rabinowitz, supra; Harris v. United States, supra; State v. Mark, supra.* The officers apprehended by means of an arrest warrant a known suspect who they had reliable information carried a gun. This information was obtained from the co-tenant of the apartment which was searched. Upon his arrest, Bynum's person was searched in vain for the gun. Bynum was apprehended without a shirt or jacket, therefore it was reasonable for the police to look first in the closet a few steps away for the shirt, jacket and gun. Not finding the gun there they proceeded to the bed, again within reach of where Bynum was found. To deny the legality of a search for that weapon in areas in which Bynum had access for the purpose of secreting it would itself be unreasonable. Mr. Chief Justice Weintraub aptly stated in *State v. Fioravanti*, 46 *N. J.* 122–123: "The Constitution should not be read to quarrel with the common sense of a situation." The police search here did not exceed the bounds of common sense under the facts.

Reversed.

*For reversal*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO.—6.

*For affirmance*—None.