UNITED STATES *v.* Di RE.

No. 61.   Argued October 17, 1947.—Decided January 5, 1948.

*Frederick Bernays Wiener* argued the cause for the United States. With him on the brief were *Solicitor General Perlman, Robert S. Erdahl* and *Beatrice Rosenberg*.

*Charles J. McDonough* argued the cause for respondent. With him on the brief was *John F. Connelly*.

MR. JUSTICE JACKSON delivered the opinion of the Court.

Michael Di Re was convicted on a charge of knowingly possessing counterfeit gasoline ration coupons in violation of § 301 of the Second War Powers Act, 1942.[1] The decisive evidence was that obtained by search of his person, after he was arrested without a warrant of any kind. The Circuit Court of Appeals, Second Circuit, considered that any question as to the timeliness of his objection to this evidence was eliminated by its disposition on its merits by the District Court, and, one judge dissenting, it held both his search and arrest to have been illegal.

---

[1] 50 U. S. C. App. (Supp. V, 1946), § 633.

.

The Government was granted certiorari,[2] raising no question other than the correctness of the holding by the Court of Appeals that the evidence was the fruit of an illegal arrest and search.

An investigator for the Office of Price Administration was informed by one Reed that he was to buy counterfeit gasoline ration coupons from a certain Buttitta at a named place in the City of Buffalo, New York. The investigator and a detective from the Buffalo Police Department trailed Buttitta's car and finally came upon it parked at the appointed place. They went to the car and found the informer Reed, the only occupant of the rear seat, holding in his hand two gasoline ration coupons which later proved to be counterfeit. Reed, on being asked, said he obtained them from Buttitta, who was sitting in the driver's seat. Beside Buttitta sat Di Re. All three were taken into custody, "frisked" to make sure they had no weapons and were then taken to the police station. Here Di Re complied with a direction to put the contents of his pockets on a table. Two gasoline and several fuel oil ration coupons were laid out. He said he had found them in the street. About two hours later, after questioning, he was "booked" and thoroughly searched. One hundred inventory gasoline ration coupons were found in an envelope concealed between his shirt and underwear. These, as well as the gasoline coupons earlier disclosed, proved to be counterfeit. Their introduction as evidence, over the objection of the defendant, was held by the court below to require reversal of the conviction.[3]

## I.

The Government now defends the search upon alternative grounds: 1, that search of Di Re was justified as

[2] 331 U. S. 800.

[3] 159 F. 2d 818.

incident to a lawful arrest; 2, that search of his person
was justified as incident to search of a vehicle reasonably
believed to be carrying contraband. We consider the
second ground first.

The claim is that officers have the right, without a war-
rant, to search any car which they have reasonable cause
to believe carries contraband, and incidentally may search
any occupant of such car when the contraband sought is
of a character that might be concealed on the person.
This contention calls, first, for a determination as to
whether the circumstances gave a right to search this
car.

The belief that an automobile is more vulnerable to
search without warrant than is other property has its
source in the decision of *Carroll* v. *United States,* 267 U. S.
132. That search was made and its validity was upheld
under the search and seizure provisions enacted for en-
forcement of the National Prohibition Act and of that
Act alone. Transportation of liquor in violation of that
Act subjected first the liquor, and then the vehicle in
which it was found, to seizure and confiscation, and the
person "in charge thereof" to arrest.[4] The Court reviewed

---

[4] Section 26, Title II of the National Prohibition Act provided in
part as follows: "When . . . any officer of the law shall discover any
person in the act of transporting in violation of the law, intoxicating
liquors in any wagon, buggy, automobile, water or air craft, or other
vehicle, it shall be his duty to seize any and all intoxicating liquors
found therein being transported contrary to law. Whenever intoxi-
cating liquors transported or possessed illegally shall be seized by an
officer he shall take possession of the vehicle and team or automobile,
boat, air or water craft, or any other conveyance, and shall arrest
any person in charge thereof. . . ." In the *Carroll* case it was said
(267 U. S. at 155) that this section was intended "to reach and destroy
the forbidden liquor in transportation and the provisions for for-
feiture of the vehicle and the arrest of the transporter were inciden-
tal"; and (267 U. S. at 158) "the right to search and the validity
of the seizure are not dependent on the right to arrest. They are

the legislative history of enforcement legislation and concluded (at p. 147), "The intent of Congress to make a distinction between the necessity for a search warrant in the searching of private dwellings and in that of automobiles and other road vehicles in [5] the enforcement of the Prohibition Act is thus clearly established by the legislative history of the Stanley Amendment. Is such a distinction consistent with the Fourth Amendment? We think that it is. The Fourth Amendment does not denounce all searches or seizures, but only such as are unreasonable." The progeny of the *Carroll* case likewise dealt with searches and seizures under this Act. *Husty* v. *United States,* 282 U. S. 694.

Obviously the Court should be reluctant to decide that a search thus authorized by Congress was unreasonable and that the Act was therefore unconstitutional. In view of the strong presumption of constitutionality due to an Act of Congress, especially when it turns on what is "reasonable," the *Carroll* decision falls short of establishing a doctrine that, without such legislation, automobiles nonetheless are subject to search without warrant in enforcement of all federal statutes. This Court has never yet said so. The most that can be said is that some of the language by which the Court justified the search and seizure legislation in the *Carroll* case might be used to make a distinction between what is a reasonable search as applied to an automobile and as applied to a residence or fixed premises, even in absence of legislation.

We need not decide whether, without such Congressional authorization as was found controlling in the *Car-*

---

dependent on the reasonable cause the seizing officer has for belief that the contents of the automobile offend against the law. The seizure in such a proceeding comes before the arrest as Section 26 indicates . . . ."

[5] This word "in" is erroneously printed "is" in the case as reported.

*roll* case, any automobile is subject to search without warrant on reasonable cause to believe it contains contraband. In the case before us there appears to have been no search of the car itself. No one on the spot seems to have thought there was cause for searching it, or that it was subject to forfeiture. The nature of ration tickets, the contraband involved, was not such that a car would be necessary or advantageous in carrying them except as an incident of carrying the person. When the question of admissibility of this evidence arose in the trial court, counsel for the Government made no claim that there had been search or cause for search of the car. No question of fact concerning such a claim has been resolved by the trial court or the jury.

Assuming, however, without deciding, that there was reasonable cause for searching the car, did it confer an incidental right to search Di Re? It is admitted by the Government that there is no authority to that effect, either in the statute or in precedent decision of this Court, but we are asked to extend the assumed right of car search to include the person of occupants because "common sense demands that such right exist in a case such as this where the contraband sought is a small article which could easily be concealed on the person."

This argument points up the different relation of the automobile to the crime in the *Carroll* case than in the one before us. An automobile, as was there pointed out, was an almost indispensable instrumentality in large-scale violation of the National Prohibition Act, and the car itself therefore was treated somewhat as an offender and became contraband. But even the National Prohibition Act did not direct the arrest of all occupants but only of the person in charge of the offending vehicle, though there is better reason to assume that no passenger in a car loaded with liquor would remain innocent of knowledge

of the car's cargo than to assume that a passenger must know what pieces of paper are carried in the pockets of the driver.

The Government says it would not contend that, armed with a search warrant for a residence only, it could search all persons found in it. But an occupant of a house could be used to conceal this contraband on his person quite as readily as can an occupant of a car. Necessity, an argument advanced in support of this search, would seem as strong a reason for searching guests of a house for which a search warrant had issued as for search of guests in a car for which none had been issued. By a parity of reasoning with that on which the Government disclaims the right to search occupants of a house, we suppose the Government would not contend that if it had a valid search warrant for the car only it could search the occupants as an incident to its execution. How then could we say that the right to search a car without a warrant confers greater latitude to search occupants than a search by warrant would permit?

We see no ground for expanding the ruling in the *Carroll* case to justify this arrest and search as incident to the search of a car. We are not convinced that a person, by mere presence in a suspected car, loses immunities from search of his person to which he would otherwise be entitled.

II.

The other ground on which the Government defended the search of Di Re, and the only one on which it relied at the trial, is that the officers justifiably arrested him and that this conferred a right to search his person. If he was lawfully arrested, it is not questioned that the ensuing search was permissible. Hence we must examine the circumstances and the law of arrest.

Some members of this Court rest their conclusion that the arrest was invalid on § 180 of the New York Code of Criminal Procedure which requires an officer making an arrest without a warrant to inform the suspect of the cause of arrest, except when it is made during commission of the crime or when in pursuit after an escape.[6] This question was first raised from the Bench during argument in this Court. Di Re did not assert this ground of invalidity at the trial. Had he done so the Government might have met it with proof of circumstances which in themselves would show that Di Re had been effectively informed, even if the circumstances fell short of establishing the statutory exception. The proceedings below did not develop the facts concerning Di Re's arrest in connection with this requirement. Inasmuch as the issue would lead to exploration of the law as to waiver when the defense was not raised in either court below, or indeed by the petition here, and as to applicability of the statute if, as the Government contends, lack of express declaration was unnecessary because circumstances supplied the required information, we do not undertake to determine on this record whether Di Re's arrest satisfied this provision of the New York law.

The arrest was challenged in the courts below on the ground that it violated another provision of New York law which was considered to be controlling on the subject. The court below assumed that the arresting officer, a state officer, derived his authority to arrest Buttitta and Reed, although it was for a federal crime, from

---

[6] Section 180 provides:

"When arresting a person without a warrant the officer must inform him of the authority of the officer and the cause of the arrest, except when the person arrested is in the actual commission of a crime, or is pursued immediately after an escape."

See also *People* v. *Marendi*, 213 N. Y. 600, 610, 107 N. E. 1058, 1061. Cf. *John Bad Elk* v. *United States*, 177 U. S. 529; *Christie* v. *Leachinsky*, [1947] 1 All Eng. 567.

§ 177 of the New York Code of Criminal Procedure, and also considered the legality of the arrest of Di Re under paragraph 3 thereof.[7] In this Court the Government originally argued that the arrest was authorized under both paragraphs 2 and 3 of the state law, but in a supplemental brief the Government withdraws the suggestion "that the arrest of respondent can be justified under subsection 2 of Section 177 of the New York Code of Criminal Procedure." Instead, it now urges that "the validity of an arrest without a warrant for a federal crime is a matter of federal law to be determined by a uniform rule applicable in all federal courts."

We believe, however, that in absence of an applicable federal statute the law of the state where an arrest without warrant takes place determines its validity. By one of the earliest acts of Congress, the principle of which is still retained, the arrest by judicial process for a federal offense must be "agreeably to the usual mode of process against offenders in such state." [8] There is no reason to

---

[7] Section 177 of the New York Code of Criminal Procedure provides:

"A peace officer may, without a warrant, arrest a person,

"1. For a crime, committed or attempted in his presence;

"2. When the person arrested has committed a felony, although not in his presence;

"3. When a felony has in fact been committed, and he has reasonable cause for believing the person to be arrested to have committed it."

[8] The Act of September 24, 1789 (Ch. 20, § 33, 1 Stat. 91), concerning arrest with warrant, provided: "That for any crime or offence against the United States, the offender may, by any justice or judge of the United States, or by any justice of the peace, or other magistrate of any of the United States where he may be found agreeably to the usual mode of process against offenders in such state, and at the expense of the United States, be arrested, and imprisoned or bailed, as the case may be, for trial before such court of the United States as by this act has cognizance of the offence." This provision has remained substantially similar to this day. 18 U. S. C. § 591. See also 1 Ops. Atty. Gen. 85, 86.

believe that state law is not an equally appropriate standard by which to test arrests without warrant, except in those cases where Congress has enacted a federal rule. Indeed the enactment of a federal rule in some specific cases seems to imply the absence of any general federal law of arrest.

Turning to the Acts of Congress to find a rule for arrest without warrant, we find none which controls such a case as we have here and none that purports to create a general rule on the subject. If we were to try to find or fashion a federal rule for arrest without warrant, it appears that the federal legislative materials are meager, inconsistent and inconclusive. Federal Bureau of Investigation officers are authorized only "to make arrests without warrant for felonies which have been committed and which are cognizable under the laws of the United States, in cases where the person making the arrest has reasonable grounds to believe that the person so arrested is guilty of such felony and where there is a likelihood of the person escaping before a warrant can be obtained for his arrest, but the person arrested shall be immediately taken before a committing officer." [9] However, marshals and their deputies "shall have the power to make arrests without warrant for any offense against the laws of the United States committed in their presence or for any felony cognizable under the laws of the United States in cases where such felony has in fact been or is being committed and they have reasonable grounds to believe that the person to be arrested has committed or is committing it," [10] and they are also given the same powers as sheriffs in the same state may have, by law, in executing the laws thereof.[11]

In denouncing unlawful search by federal officers as a misdemeanor, Congress provided that it should not

---

[9] 48 Stat. 1008, 49 Stat. 77, 5 U. S. C. § 300 (a).

[10] 49 Stat. 378, 28 U. S. C. § 504 (a).

[11] 1 Stat. 425, 12 Stat. 282, 28 U. S. C. § 504.

apply to one "arresting or attempting to arrest any person committing or attempting to commit an offense in the presence of such officer, agent, or employee, or who has committed, or who is suspected on reasonable grounds of having committed, a felony." [12] Thus the legislative sources, while yielding some common provisions, also contain many inconsistencies. No act of Congress lays down a general federal rule for arrest without warrant for federal offenses. None purports to supersede state law. And none applies to this arrest which, while for a federal offense, was made by a state officer accompanied by federal officers who had no power of arrest. Therefore the New York statute provides the standard by which this arrest must stand or fall.

Since, under that law, any valid arrest of Di Re, if for a misdemeanor must be for one committed in the arresting officer's presence, and if for a felony must be for one which the officer had reasonable grounds to believe the suspect had committed, we seek to learn for what offense this man was taken into custody. The arresting officer testified that he did not tell Di Re what he was being arrested for. After he was taken to the station he was "booked," but the record does not show upon what charge. He was later indicted for the misdemeanor of knowingly possessing counterfeit gasoline ration coupons in violation of Ration Order No. 5 (c) of the Office of Price Administrator. But on appeal the Government suggested the arrest may be defended as one for a felony because probable grounds existed for believing him guilty of the felony of conspiracy under § 37 of the Criminal Code,[13] and in this Court for the first time it suggests that there were grounds for arrest on a charge of possessing a known counterfeit writing with intent to utter it as true for the

---

[12] 49 Stat. 877, 18 U. S. C. § 53 (a).

[13] 18 U. S. C. § 88.

purpose of defrauding the United States, a felony under § 28 of the Criminal Code.[14]

Assuming, without deciding, that an arrest without a warrant on a charge not communicated at the time may later be justified if the arresting officer's knowledge gave probable grounds to believe any felony found in the statute books had been committed, we are brought to the inquiry whether the circumstances at that time afforded such grounds.

The Government now concedes that the only person who committed a possible misdemeanor in the open presence of the officer was Reed, the Government informer who was found visibly possessing the coupons. Of course, as to Buttitta they had previous information that he was to sell such coupons to Reed, and Reed gave information that he had done so. But the officer had no such information as to Di Re. All they had was his presence, and if his presence was not enough to make a case for arrest for a misdemeanor, it is hard to see how it was enough for the felony of violating § 28 of the Criminal Code.

The relevant difference between Ration Order 5 (c) and § 28 of the Criminal Code is that the former declares mere possession of a counterfeit coupon an offense, while the latter defines a felony which consists not merely of possession but also of knowledge of the instrument's counterfeit character, and also of intent to utter it as true. It is admitted that at the time of the arrest the officers had no information implicating Di Re and no information pointing to possession of any coupons, unless his presence in the car warranted that inference. Of course they had no information hinting further at the knowledge and intent required as elements of the felony under the statute.

---

[14] 18 U. S. C. § 72.

## III.

The Government's defense of the arrest relies most heavily on the conspiracy ground. In view of Reed's character as an informer, it is questionable whether a conspiracy is shown. But if the presence of Di Re in the car did not authorize an inference of participation in the Buttitta-Reed sale, it fails to support the inference of any felony at all.

There is no evidence that it is a fact or that the officers had any information indicating that Di Re was in the car when Reed obtained ration coupons from Buttitta, and none that he heard or took part in any conversation on the subject. Reed, the informer, certainly knew it if any part of his transaction was in Di Re's presence. But he was not called as a witness by the Government, nor shown to be unavailable, and we must assume that his testimony would not have been helpful in bringing guilty knowledge home to Di Re.

An inference of participation in conspiracy does not seem to be sustained by the facts peculiar to this case. The argument that one who "accompanies a criminal to a crime rendezvous" cannot be assumed to be a bystander, forceful enough in some circumstances, is farfetched when the meeting is not secretive or in a suspicious hide-out but in broad daylight, in plain sight of passers-by, in a public street of a large city, and where the alleged substantive crime is one which does not necessarily involve any act visibly criminal. If Di Re had witnessed the passing of papers from hand to hand, it would not follow that he knew they were ration coupons, and if he saw that they were ration coupons, it would not follow that he would know them to be counterfeit. Indeed it appeared at the trial to require an expert to establish that fact. Presumptions of guilt are not lightly to be indulged from mere meetings.

Moreover, whatever suspicion might result from Di Re's mere presence seems diminished, if not destroyed, when Reed, present as the informer, pointed out Buttitta, and Buttitta only, as a guilty party. No reason appears to doubt that Reed willingly would involve Di Re if the nature of the transaction permitted. Yet he did not incriminate Di Re. Any inference that everyone on the scene of a crime is a party to it must disappear if the Government informer singles out the guilty person.

## IV.

The Government also makes, and several times repeats, an argument to the effect that the officers could infer probable cause from the fact that Di Re did not protest his arrest, did not at once assert his innocence, and silently accepted the command to go along to the police station. One has an undoubted right to resist an unlawful arrest, and courts will uphold the right of resistance in proper cases. But courts will hardly penalize failure to display a spirit of resistance or to hold futile debates on legal issues in the public highway with an officer of the law. A layman may not find it expedient to hazard resistance on his own judgment of the law at a time when he cannot know what information, correct or incorrect, the officers may be acting upon. It is likely to end in fruitless and unseemly controversy in a public street, if not in an additional charge of resisting an officer. If the officers believed they had probable cause for his arrest on a felony charge, it is not to be supposed that they would have been dissuaded by his profession of innocence.

It is the right of one placed under arrest to submit to custody and to reserve his defenses for the neutral tribunals erected by the law for the purpose of judging his case. An inference of probable cause from a failure to engage in discussion of the merits of the charge with arresting

officers is unwarranted. Probable cause cannot be found from submissiveness, and the presumption of innocence is not lost or impaired by neglect to argue with a policeman. It is the officer's responsibility to know what he is arresting for, and why, and one in the unhappy plight of being taken into custody is not required to test the legality of the arrest before the officer who is making it.

The Government's last resort in support of the arrest is to reason from the fruits of the search to the conclusion that the officer's knowledge at the time gave them grounds for it. We have had frequent occasion to point out that a search is not to be made legal by what it turns up.[15] In law it is good or bad when it starts and does not change character from its success.

## V.

We meet in this case, as in many, the appeal to necessity. It is said that if such arrests and searches cannot be made, law enforcement will be more difficult and uncertain. But the forefathers, after consulting the lessons of history, designed our Constitution to place obstacles in the way of a too permeating police surveillance, which they seemed to think was a greater danger to a free people than the escape of some criminals from punishment. Taking the law as it has been given to us, this arrest and search were beyond the lawful authority of those who executed them. The conviction based on evidence so obtained cannot stand.

*Affirmed.*

THE CHIEF JUSTICE and MR. JUSTICE BLACK dissent.

---

[15] See, for example, *Byars* v. *United States,* 273 U. S. 28, 29.