Docket No. 99031.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. RAYMOND E. GARVIN, Appellant.

*Opinion filed March 23, 2006.*

JUSTICE KILBRIDE delivered the judgment of the court, with opinion.

Chief Justice Thomas and Justices Fitzgerald, Garman, and Karmeier concurred in the judgment and opinion.

Justice McMorrow, joined by Justice Freeman, specially concurred.

## OPINION

In this case, defendant Raymond E. Garvin challenges the circuit court of Du Page County's denial of his motion to quash arrest and suppress evidence and, in an issue of first impression before this court, the constitutionality of section 5–4–3 of the Unified Code of Corrections (730 ILCS 5/5–4–3 (West 2002)). The latter argument challenges the statute both on its face and as applied in this case under the search and seizure provisions of our state and federal constitutions. We affirm the appellate court's judgment affirming the trial court's denial of the motion, albeit on a different basis, and upholding the constitutionality of the statute.

## I. BACKGROUND

Sometime prior to 4:45 a.m. on December 29, 2001, Gerhardt Roth called the Franklin Park police to report he had seen a license plate stolen from one of his company's vehicles on a white van with a "CompUSA" logo on its side. He tracked the van after it left the company's property and noticed a white car also following the van. Ultimately, both vehicles pulled into a gas station. Pursuant to Roth's call, Officer Henninger was dispatched to the gas station and observed a white car and a white CompUSA van in the parking lot.

At the gas station, Roth told the officer that he had seen the two vehicles on his company's property and that defendant and two other men had been in or around the van. One of the other two men was still in the car. Defendant and the other man came out of the convenience store adjoining the gas station and walked up to the officer. While they were talking, Henninger obtained the names of the three men and ran those names through the police computer. He received a radio message that the Bensenville police department was looking for a similar van and a white Ford Thunderbird in connection with a possible theft from Emery Worldwide. Henninger requested officers from Bensenville be dispatched to the scene. In addition, the officer checked the van's vehicle identification number and discovered it, too, had been reported stolen.

Henninger also received information that one of the men with defendant was wanted on an outstanding warrant, and he arrested that man. Defendant was later arrested without a warrant. Defendant subsequently asked the Bensenville police to remove his wallet from the van and admitted he had been in the vicinity of Emery Worldwide earlier in the evening.

Defendant was charged with burglary (720 ILCS 5/19–1(a) (West 2000)), theft (720 ILCS 5/16–1(a)(1)(A) (West 2000)), and possession of burglary tools (720 ILCS 5/19–2(a) (West 2000)). He filed a motion in the circuit court of Du Page County seeking to quash his arrest for lack of probable cause and to suppress his postarrest statements. Following a hearing, the circuit court denied defendant's motion. The State subsequently dropped the charge of possession of burglary tools.

Defendant entered into a stipulation that included both his postarrest statements to the Bensenville police and the discovery of his wallet in the white van by the Franklin Park police. Following a

˘2˘

stipulated bench trial, defendant was convicted of burglary and theft. He was sentenced to concurrent prison terms of 6½ years and ordered to submit to the State a blood sample for deoxyribonucleic acid (DNA) analysis pursuant to section 5–4–3 of the Unified Code of Corrections (Code) (730 ILCS 5/5–4–3 (West 2002)). The trial court denied defendant's motion for a new trial alleging the court improperly declined to quash his arrest and suppress his statements.

On appeal, defendant first argued the trial court should have granted his motion to quash and suppress. While the appellate court agreed no probable cause existed for defendant's arrest, it deemed the erroneous probable cause finding harmless because it believed sufficient evidence of guilt was adduced at trial without the admission of the improper evidence. 349 Ill. App. 3d 845, 851-52. The appellate court also concluded defendant could not attack the admission of his inculpatory statement placing his wallet inside the stolen van because he had stipulated the wallet found in the van was his. 349 Ill. App. 3d at 852.

Defendant also challenged, both on its face and as applied, the constitutionality of section 5–4–3, mandating the submission of a DNA sample for analysis and entry into a computer database. Applying a balancing test, the appellate court found the statutory provision constitutional both because the blood test required minimal physical intrusion and because the state's interest in collecting and storing DNA to deter and prosecute recidivists outweighed defendant's diminished privacy interest as a convicted felon. 349 Ill. App. 3d at 855-56. Defendant's petition for rehearing was denied. This court allowed defendant's petition for leave to appeal. 177 Ill. 2d R. 315(a).

## II. ANALYSIS

Defendant raises two distinct issues on appeal. First, he argues the appellate court correctly recognized the lack of probable cause for his arrest but erroneously believed the admission of his subsequent police statements was harmless error. 349 Ill. App. 3d at 851. Next, he contends the mandatory submission of blood for DNA analysis pursuant to section 5–4–3 of the Code (730 ILCS 5/5–4–3 (West 2002)) is unconstitutional because it violates, both on its face and as applied, his protections against unreasonable searches and seizures

under the Illinois and United States constitutions, an issue not previously considered by this court. We address these issues in turn.

## A. Probable Cause

Initially, defendant asserts the trial court should have granted his motion to quash arrest and suppress evidence based on a lack of probable cause. He maintains probable cause was absent because the police had no particularized suspicion that he was involved in any criminal activity and instead relied on his proximity to another man named in an unrelated warrant. See *United States v. Di Re*, 332 U.S. 581, 592-94, 92 L. Ed. 210, 219-20, 68 S. Ct. 222, 227-28 (1948). See also *Ybarra v. Illinois*, 444 U.S. 85, 91, 62 L. Ed. 2d 238, 245, 100 S. Ct. 338, 342 (1979). Defendant claims the only evidence linking him to the charged crimes was Roth's eyewitness statement identifying him as one of three men who had been "in or around" the stolen van in the gas station parking lot.

Reviewing the denial of defendant's motion alleging a lack of probable cause *de novo* (*People v. Sorenson*, 196 Ill. 2d 425, 431 (2001)), we agree that mere proximity to another individual is insufficient to support a finding of probable cause (see *Di Re*, 332 U.S. at 592-94, 92 L. Ed. at 219-20, 68 S. Ct. at 227-28). We disagree, however, with defendant's characterization of the relevant evidence.

Officer Henninger was the only witness at the hearing on defendant's motion. He arrived at the gas station in response to a call from Roth reporting a white van with a "CompUSA" logo on its side bearing license plates stolen from Roth's company. When the officer arrived, he saw a van matching that description parked on the west side of the lot. He also noted a white car located approximately 2½ car lengths away from the van, parked directly behind the convenience store adjoining the gas station. It was an early winter morning, the lot was well lit, and Henninger did not recall any other customers present.

Roth approached Officer Henninger and pointed out the van with the stolen plates, stating he had noticed the unauthorized van near his company prior to recognizing the stolen license plate. Roth also indicated he had seen the white car follow the van and that the vehicles had pulled into the gas station together.

Officer Henninger then ran the license plate number on the van and verified the plate was stolen. While the plate was being run, defendant and another man came out of the convenience store together and approached Henninger. Roth identified the men as two of the three he had seen in or around the van. The officer talked to the men as he continued to investigate Roth's report. Henninger then received a message that the Bensenville Police were looking for two vehicles possibly stolen from Emery Worldwide: a van matching the description of the one in the lot and a white sedan. He responded by requesting the dispatch of Bensenville officers to the scene. At some point, the officer also ran a check on the van's vehicle identification number and discovered it, too, had been reported stolen. Henninger believed that defendant was arrested without a warrant between 4:30 a.m. and 5 a.m.

Contrary to defendant's claim, there was far more evidence linking him to the stolen license plates than Roth's bare statement that he had observed defendant in or around a van bearing those plates. Before noticing the stolen plates, Roth had observed the unauthorized van on his company property during the early morning hours. After recognizing the plates on the van as belonging to his company, he reported the theft to police and personally trailed the van and the white car that was following it to the gas station, where the two vehicles parked near each other. Although Officer Henninger could not recall if Roth had indicated whether defendant had exited the van or the car, Roth had identified defendant as one of the men who had been in or around the van bearing the stolen plate and that, itself, was also subsequently determined to be stolen.

As the State notes, logic dictates that at least two persons had to have been involved in the theft at Roth's company to have been able to drive both the van and the white car that followed it. There was no evidence the van or the car stopped anywhere to drop off any passengers or to pick up additional ones between leaving Roth's company property and parking at the gas station. Thus, logically, the same individuals were in the van and the car when the vehicles left Roth's company property and when they parked at the gas station. Moreover, Officer Henninger did not recall seeing any other customers at the gas station.

One man was observed in the white car parked near the van at the gas station. Defendant was one of two other men who together came out of the convenience store and approached Officer Henninger. Roth identified defendant as one of the men he had previously seen in or around the van. Based on these facts, it was reasonable to infer that the three men were connected with one another and had been personally observed by the eyewitness and identified as the same men who had been in or around the van bearing the stolen license plate. Based on this connection, the brief time that had passed since the theft of the license plate, and the implausibility that anyone had left or entered the vehicles between their departure from Roth's property and their arrival at the gas station, it was reasonable to conclude defendant was involved in that crime. This particularized suspicion distinguishes this case from *Ybarra* and *Di Re*.

In *Ybarra*, the police had a warrant limiting their search to a bar and a bartender. Once at the bar, they expanded the scope of that search to include everyone present, including the defendant, who was found to have narcotics in his pocket. The Supreme Court held the drug evidence should have been suppressed because the defendant's mere proximity to others who were "independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Ybarra*, 444 U.S. at 91, 62 L. Ed. 2d at 245, 100 S. Ct. at 342.

In this case, more than mere physical proximity connected defendant to the theft of the license plates, and the police did not expand the scope of a previously authorized search. Logic and a credible eyewitness connected the three men present at the gas station to the earlier theft. In *Ybarra*, the only known connection between the defendant and the bar being searched was the defendant's presence in the bar at that particular time. Here, defendant was not simply a patron who happened to be at the gas station when it was searched pursuant to a warrant. While particularized suspicion was lacking in *Ybarra*, the same cannot be said in this case.

Similarly, the defendant in *Di Re* was arrested because he was in the front seat of a car next to the driver, who an informant sitting in the backseat said had given him two gasoline ration coupons later determined to be counterfeit. While in custody, the defendant was found to have a large number of counterfeit gasoline and fuel oil

ration coupons in his possession. *Di Re*, 332 U.S. at 583, 92 L. Ed. at 214, 68 S. Ct. at 223. At the time of the defendant's arrest, however, the police had no evidence that he had played any role in the driver's transaction with the informant. Indeed, the informant specifically named only the driver as a participant when the police arrived on the scene. *Di Re*, 332 U.S. at 592, 92 L. Ed. at 219, 68 S. Ct. at 227. The Court stated that the defendant's mere presence in the car was not sufficient to justify his arrest and subsequent search. *Di Re*, 332 U.S. at 592-93, 92 L. Ed. at 219, 68 S. Ct. at 227-28. As in *Ybarra*, there was no particularized suspicion that the defendant had been involved in any crime. For that reason, *Di Re* is also distinguishable from the instant case.

The special concurrence relies on *People v. Lee*, 214 Ill. 2d 476, 484 (2005), not cited in the parties' briefs. In *Lee*, no evidence of any actual criminal activity existed at the time of the defendant's arrest. The police simply responded to a citizen's complaint alleging that three men were selling drugs on a corner located in an area designated by the city to be " 'high-drug' " and " 'high-gang.' " *Lee*, 214 Ill. 2d at 478. The same citizen had previously made other complaints, "[m]ost of them *** well-founded," according to the police.

After parking two blocks away from the named intersection, the police observed the defendant and two other men for three to five minutes. During this time, a van drove up and parked, and the officers saw the three men speak to the driver. Notably, no illegal acts were observed, and the officers noticed nothing indicative of drug-related activities, such as an exchange of money or packages, as required by the statute. A preliminary pat-down search of the men failed to provide any evidence of contraband. Despite the complete absence of any evidence that the men were connected to any drug-related activities, defendant and his companions were arrested. *Lee*, 214 Ill. 2d at 478-79. Only after being arrested was the defendant found to have cocaine in his pants pocket. *Lee*, 214 Ill. 2d at 481.

Unlike *Lee*, defendant in this case was undeniably linked to a crime that was readily observable by the officer on the scene. The presence of the stolen license plate on the van established that a theft had actually been committed. While at the gas station, Officer Henninger verified that the plate was stolen, confirming the

commission of a crime and corroborating Roth's statements. He also knew from speaking directly with the complainant at the scene that defendant and the two other men had been in or around the van bearing the stolen plate. In addition, the officer knew Roth had personally followed the van and the car from the scene of the license-plate theft to the gas station and had not reported anyone entering or leaving the vehicles. The van had also been reported stolen. Officer Henninger continued to investigate the crime when defendant and his companion came out of the convenience store.

This court has stated that probable cause exists if the facts and surrounding circumstances are sufficient to justify a reasonable belief by the arresting officer that the defendant is or has been involved in a crime. *People v. Jones*, 215 Ill. 2d 261, 277 (2005). "The standard for determining whether probable cause is present is probability of criminal activity, rather than proof beyond a reasonable doubt. [Citations.]" *Lee*, 214 Ill. 2d at 485. If there are questions both of whether a crime has even been committed as well as of whether a particular individual committed the crime, additional evidence is required to show probable cause. *Lee*, 214 Ill. 2d at 485.

In *Lee*, even the existence of a crime was in question, and the defendant's actions revealed no hint of illegality. With the enhanced evidentiary burden imposed on the State in the absence of a definitive crime, probable cause did not exist in *Lee*. *Lee*, 214 Ill. 2d at 485. In contrast, here a crime had undeniably been committed, making the enhanced burden placed on the State in *Lee* inapplicable. Moreover, here an eyewitness had identified the van bearing the stolen license plate and the white car accompanying it as the same two vehicles he had followed, uninterrupted, from the scene of the theft to the gas station, where the police observed them. The same eyewitness also personally identified defendant as one of three men he had observed in or around the van and the white car. Based on the limited testimony adduced at the suppression hearing, defendant's presence at the time the license plate was stolen may be logically inferred, as noted previously. In light of the totality of the facts and circumstances, as viewed by an objectively reasonable officer, we believe probable cause existed at the time of defendant's arrest. See *Maryland v. Pringle*, 540 U.S. 366, 371, 157 L. Ed. 2d 769, 775, 124 S. Ct. 795, 800 (2003) (stating the relevant standard). Having made this determination, we need not address defendant's additional claim

that the appellate court erred by finding the admission of his postarrest statements during the stipulated bench trial to be harmless error. Defendant's arrest was proper; thus under the facts of this case, the admission of his subsequent custodial statements was also proper. Unlike the appellate court, we need not consider whether the admission of those statements was harmless error because we hold the trial court properly admitted them. The trial court properly denied defendant's motion to quash arrest and suppress evidence.

## B. DNA Sampling

Defendant next challenges the constitutionality of the mandate in section 5–4–3 of the Unified Code of Corrections (730 ILCS 5/5–4–3 (West 2002)) that all felons submit a blood sample for DNA profiling and entry into a computer database.

He bases his challenge on his fourth amendment right under the federal constitution to be free from unreasonable searches (U.S. Const., amends. IV, XIV), as well as its state counterpart (Ill. Const. 1970, art. I, §6). We note that defendant does not offer any arguments specifically addressing the unique aspects of our state constitutional privacy provisions, and therefore we do not consider those elements in our analysis.

Our review begins with the presumption section 5–4–3 is constitutional, and we are constrained to construe that section as constitutional whenever reasonably possible. *People v. Wilson*, 214 Ill. 2d 394, 398-99 (2005). As the challenger in this case, defendant bears the heavy burden of demonstrating a clear constitutional violation. *Wilson*, 214 Ill. 2d at 399. Since the constitutionality of a statute presents a question of law, we review this issue *de novo*. See *Wilson*, 214 Ill. 2d at 399.

Defendant contends that section 5–4–3 is unconstitutional on its face because it requires no showing of "special need" or other justification for a suspicionless search. He also asserts the section is unconstitutional as applied to him as a felon convicted of a nonsexual offense due to the purportedly low chance that the DNA information stored in the database will be useful in solving or prosecuting future crimes.

To mount a successful facial challenge, defendant must fulfill the difficult task of establishing the statute's invalidity under *any* set of

facts. *People v. Greco*, 204 Ill. 2d 400, 407 (2003). In contrast, an "as applied" challenge requires defendant to show the statute violates the constitution as it applies to him. See *Greco*, 204 Ill. 2d at 407. We first consider defendant's "as applied" challenge to the validity of section 5–4–3.

Compelled blood extractions undeniably constitute searches within the meaning of the fourth amendment of the federal constitution (*Skinner v. Railway Labor Executives Ass'n*, 489 U.S. 602, 616, 103 L. Ed. 2d 639, 659, 109 S. Ct. 1402, 1412-13 (1989)) and, as such, generally require the issuance of warrants due to the inherent interest individuals possess in their privacy and bodily integrity (*Schmerber v. California*, 384 U.S. 757, 770, 16 L. Ed. 2d 908, 919, 86 S. Ct. 1826, 1835 (1966)). Similar constitutional protection is provided by the search and seizure provision of the Illinois Constitution. *People v. Watson*, 214 Ill. 2d 271, 280 (2005), citing *In re May 1991 Will County Grand Jury*, 152 Ill. 2d 381 (1992). In evaluating the validity under the fourth amendment of this warrantless search, the critical issue is whether the intrusion was "reasonable," as that term has been judicially construed. See *Watson*, 214 Ill. 2d at 280. Thus, we must determine whether the warrantless sampling and laboratory analysis of blood taken from all convicted felons in this state as mandated by section 5–4–3 constitutes a reasonable search.

To answer this question, the parties present two alternative analytical possibilities: the special needs test and the pure balancing test. Under the special needs test, nonconsensual warrantless searches are permitted without particularized suspicion only if a "special need" exists apart from general law enforcement needs. *Ferguson v. City of Charleston*, 532 U.S. 67, 79, 149 L. Ed. 2d 205, 217, 121 S. Ct. 1281, 1289 (2001). If a special need is found, then the court balances the parties' disparate interests to determine whether the intrusion is justified. If a special need is not found, the statute is deemed constitutionally infirm. *Ferguson*, 532 U.S. at 78, 149 L. Ed. 2d at 216, 121 S. Ct. at 1288; see also *People v. Lampitok*, 207 Ill. 2d 231, 243-53 (2003) (applying the special needs test where, during a warrantless search of the probationer's motel room, police found items the probationer was barred from possessing under the terms of her probation order).

Defendant advocates the use of this approach here, asserting that the United States Supreme Court has applied it in the context of other warrantless searches. See *Ferguson*, 532 U.S. 67, 149 L. Ed. 2d 205, 121 S. Ct. 1281; *City of Indianapolis v. Edmond*, 531 U.S. 32, 42, 148 L. Ed. 2d 333, 344, 123 S. Ct. 447, 454 (2000). Consequently, he claims the appellate court erred by forgoing the special needs test in favor of the less rigorous pure balancing test. In that test, courts perform only the balancing portion of the special needs test without requiring the showing of a special need apart from general law enforcement.

This balancing-only test has been relied on by many other jurisdictions confronted with fourth amendment challenges to DNA statutes similar to the one at issue here. *Velasquez v. Woods*, 329 F.3d 420 (5th Cir. 2003); *Schlicher v. (NFN) Peters, I&I*, 103 F.3d 940 (10th Cir. 1996); *Rise v. Oregon*, 59 F.3d 1556 (9th Cir. 1995); *Jones v. Murray*, 962 F.2d 302 (4th Cir. 1992); *D.B. v. State*, 861 So. 2d 4 (Ala. Crim. App. 2003); *In re Maricopa County Juvenile Action Nos. JV-512600 & JV-512797*, 187 Ariz. 419, 930 P.2d 496 (App. 1996); *L.S. v. State*, 805 So. 2d 1004 (Fla. App. 2001); *Patterson v. State*, 742 N.E.2d 4 (Ind. App. 2000); *State v. Maass*, 275 Kan. 328, 64 P.3d 382 (2003); *Landry v. Attorney General*, 429 Mass. 336, 709 N.E.2d 1085 (1999); *Cooper v. Gammon*, 943 S.W.2d 699 (Mo. App. 1997); *Gaines v. State*, 116 Nev. 359, 998 P.2d 166 (2000); *State ex rel. Juvenile Department v. Orozco*, 129 Or. App. 148, 878 P.2d 432 (1994); *Johnson v. Commonwealth*, 259 Va. 654, 529 S.E.2d 769 (2000); *Doles v. State*, 994 P.2d 315 (Wyo. 1999).

We note that the United States Supreme Court has not expressly addressed the propriety of either test in evaluating the constitutionality of DNA collection and analysis statutes. We need not venture a guess here as to that court's ultimate decision on the issue because the outcome in this case is the same under either test.

The primary purpose of section 5–4–3 is the creation of a criminal DNA database. Defendant asserts that this is not a special need apart from general law enforcement because the information in the database ultimately may be used to further future criminal investigations. We believe defendant's expansive reading of the case law concerning the boundary between a special need and general law enforcement is flawed. Under defendant's interpretation, any search

that could potentially advance a criminal investigation either immediately or at some unknown point in the future would constitute general law enforcement and, thus, would be unconstitutional in the absence of a warrant. The language and circumstances in *Edmond* and *Ferguson* do not support such a broad approach.

In *Edmond*, the Court emphasized the importance of examining the primary purpose of the search. In that case, Indiana's primary purpose in establishing roadside checkpoints was to uncover ordinary criminal conduct involving illegal narcotics that was occurring at the time of the checkpoint stop. *Edmond*, 531 U.S. at 40-41, 148 L. Ed. 2d at 343, 123 S. Ct. at 453-54. In *Ferguson*, the Court examined a state hospital program that tested pregnant women's blood for drug usage without their consent. The Court concluded the program's primary purpose was to obtain evidence of tested patients' criminal conduct to force them into treatment by threat of arrest and prosecution and noted the extensive police involvement throughout the development of the program. That primary purpose did not fall within the category of a special need. *Ferguson*, 532 U.S. at 84, 149 L. Ed. 2d at 220, 121 S. Ct. at 1291-92.

The purpose of creating a DNA profile database is distinct from the purposes found to exist in *Edmond* and *Ferguson*. In those cases, the search conducted uncovered only evidence of the tested individual's past and present wrongdoings, without any benefit to future criminal investigations. Thus, evidence from a dragnet-style search was used as a springboard to uncover otherwise unknown criminal activity.

Here, the statute figuratively puts the cart before the horse. The primary goal is not to uncover previously unknown crimes but to aid in the resolution of crimes after they have been committed. The database established by section 5–4–3 has little use unless crimes leaving behind a DNA trail are committed. If DNA from those crimes can be collected, the database may be useful in delineating the relevant pool of suspects by either identifying a particular individual or, equally important, excluding a potential suspect from consideration. This purpose is in stark contrast to those found to be invalid in *Edmond* and *Ferguson*.

While the blanket searches in *Edmond* and *Ferguson* did not serve a special need outside that of general law enforcement, the

˘12˘

statutory searches here are "not designed to discover and produce evidence of a specific individual's criminal wrongdoings. [Citations.] Rather, they essentially prove nothing. [Citations.] That is, a DNA sample is evidence only of an individual's genetic code, which does not, on its own, show the commission of a crime. [Citations.] 'It is this distinction that removes the collection and cataloguing of DNA information from the normal need for law enforcement.' [Citations.]" *People v. Hall*, 352 Ill. App. 3d 537, 549 (2004). See also *United States v. Kimler*, 335 F.3d 1132, 1146 (10th Cir. 2003) (noting that building a genetic database is beyond general law enforcement needs). While under a broad definition, the collection, analysis, and storage of DNA is ultimately related to solving crime, it remains only potentially useful for that purpose until a crime presenting an opportunity to compare DNA samples is committed. See *Nicholas v. Goord*, No. 01 CIV 7891 (S.D.N.Y. February 6, 2003) (explaining the primary purpose of the New York DNA indexing statute was not an ordinary purpose of law enforcement by stating: "Obviously, obtaining a DNA sample for a databank is within the scope of law enforcement, broadly defined, and certainly has a relationship to the solving of crimes. But the primary purpose of collecting samples for the databank is not for the State to determine that a particular individual has engaged in some specific wrongdoing. Unlike a blood or urine sample that may contain traces of drugs, the samples of blood for the DNA databank prove nothing by themselves regarding whether the donor has committed a crime. *** They merely offer the potential that some very small percentage may be relevant to solving a crime that in all likelihood has not even been committed at the time of the search").

Moreover, our appellate court as well as courts in other jurisdictions have variously found that the main purpose of DNA sampling is to absolve innocents, identify the guilty, deter recidivism by identifying those at a high risk of reoffending, or bring closure to victims. *People v. Butler*, 354 Ill. App. 3d 57, 66-67 (2004) (finding the database may " 'absolve the innocent' " and give crime victims closure by taking the perpetrators off the street), quoting *Kincade*, 379 F.3d at 839; *United States v. Kincade*, 379 F.3d 813, 838-39 (9th Cir. 2004) (finding that deterring recidivists and obtaining closure for victims "undeniably compelling" and "monumental" interests); *In re Leopoldo L.*, 209 Ariz. 249, 254-55, 99 P.3d 578, 583-84 (1st Div.

2004) (noting the purposes of exonerating the innocent, identifying the guilty, and deterring recidivists); *People v. Shreck*, 107 P.3d 1048, 1053 (Colo. App. 2004) (listing "exonerating the innocent, solving past as well as future crimes, and deterring recidivism"); *State v. Steele*, 155 Ohio App. 3d 659, 671, 802 N.E.2d 1127, 1136 (2003) (acknowledging the purposes of creating a more accurate criminal justice system allowing for the exoneration of the innocent and the identification of the guilty in future crimes). We agree that all of these goals are distinct from traditional law enforcement practices designed to gather evidence in a particular case to solve a specific crime that has already been committed. Taken together, these purposes demonstrate a special need beyond ordinary law enforcement.

Finally, defendant contends that even if the special needs prong is met, the appellate court misapplied the balancing test, finding that his privacy interests were outweighed by the State's interest in "deterring and prosecuting recidivist criminal acts" (349 Ill. App. 3d at 856). The strength of the State's interest is self-evident. Promoting an effective and accurate criminal justice system and increasing public safety through either deterrence or removal of criminal offenders from the streets is a fundamental concern of the State and law enforcement.

Defendant argues, however, that on the other side of the balancing equation we must consider his privacy interest in his personal genetic information despite his status as a convicted felon. While we agree that a felony conviction does not obliterate all preexisting privacy rights, we recognize that those rights are significantly diminished. See *United States v. Knights*, 534 U.S. 112, 119-20, 151 L. Ed. 2d 497, 505, 122 S. Ct. 587, 591-92 (2001); *Sandin v. Conner*, 515 U.S. 472, 485, 132 L. Ed. 2d 418, 431, 115 S. Ct. 2293, 2301 (1995) (quoting earlier case law stating that " ' "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system" ' "); *Bell v. Wolfish*, 441 U.S. 520, 558, 60 L. Ed. 2d 447, 481, 99 S. Ct. 1861, 1884 (1979); *Lampitok*, 207 Ill. 2d at 250-51. Also, the intrusion created by taking the blood sample authorized by the statute has been found to be insignificant. In *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 625, 103 L. Ed. 2d 639, 665, 109 S. Ct. 1402, 1417 (1989), the

Court found that the safety and virtual absence of discomfort involved in modern blood tests makes them a minimal intrusion on individual's privacy and bodily integrity. In considering the constitutionality of other DNA sampling statutes, many other courts have also relied on this finding. See, *e.g.*, *Roe v. Marcotte*, 193 F.3d 72, 79 (2d Cir. 1999); *Jones v. Murray*, 962 F.2d 302, 307 (4th Cir. 1992); *Boling v. Romer*, 101 F.3d 1336, 1340 (10th Cir. 1996); *In re D.L.C.*, 124 S.W.3d 354, 373 (Tex. Ct. App. 2003).

As for defendant's assertion that his privacy interests remain high even in light of his felony conviction, we find the decision in *United States v. Knights*, 534 U.S. 112, 114-15, 151 L. Ed. 2d 497, 502-03, 122 S. Ct. 587, 589 (2001), instructive. In that case, a condition of the defendant's probation was his submission to warrantless searches of his home. During one of these searches, the police found evidence that he was involved in an arson conspiracy. The defendant argued the search violated his fourth amendment rights, and the Supreme Court noted that probationers' privacy rights are greatly reduced. *Knights*, 534 U.S. at 119-20, 151 L. Ed. 2d at 505, 122 S. Ct. at 591-92. Similarly, the reasonable expectation of privacy of the defendant in this case is also substantially reduced due to his status as a convicted felon. See also *Griffin v. Wisconsin*, 483 U.S. 868, 875, 97 L. Ed. 2d 709, 718, 107 S. Ct. 3164, 3169 (1987) (recognizing that the general public possesses greater liberty rights than probationers). Moreover, the statute limits access to the information stored in the database to "peace officers" (730 ILCS 5/5‒4‒3(f) (West 2002)), helping to ensure the information is used only for relevant, official purposes.

Defendant next claims the link between the statute's purpose in deterring and solving recidivist crime and its means as enacted in section 5‒4‒3 is weak because defendant is a nonsexual offender and thus unlikely to leave behind DNA evidence. In a related argument, he asserts that the State's reliance on some of its out-of-state cases is inapposite because the statutes in those cases applied only to specific categories of felons.

While DNA evidence is often left behind during the commission of sex offenses, myriad examples involving other felonies can also be imagined. For instance, hair or skin cells from an intruder could be found in a victim's home or on clothing. Alternatively, a felon could

suffer an injury during the commission of a crime, leaving behind DNA evidence in blood or tissue. As techniques in DNA retrieval and analysis develop, the likely scenarios will undoubtedly multiply. Thus, defendant's status as a nonsexual offender does not so attenuate the vital linkage between his reduced privacy interests and the State's strong interest in deterring and solving crime, as well as providing closure for crime victims, as to tip the scales of the balancing test in his favor. We hold that the State's interest in effective crime investigations and prevention, as advanced by section 5–4–3, outweighs defendant's privacy interest as a convicted felon. Defendant's constitutional challenge to section 5–4–3 as it applies to him is rejected.

Having held that section 5–4–3 is constitutional as applied to defendant, his fourth amendment facial challenge to that section necessarily fails because under at least one set of facts the statute is constitutionally valid and our overbreadth doctrine has not been used outside the context of first amendment challenges. See *People v. Greco*, 204 Ill. 2d 400, 407 (2003).

## III. CONCLUSION

For the reasons stated, we hold that there was sufficient probable cause to deny defendant's motion to quash arrest and suppress the evidence, rejecting the appellate court's contrary analysis. We also hold that the DNA sampling and database mandated by section 5–4–3 is constitutional both as applied in defendant's case and on its face. Accordingly, while we reject in part the appellate court's rationale, we affirm its ultimate judgment.

*Appellate court judgment affirmed.*

JUSTICE McMORROW, specially concurring:

In deciding defendant's claim that his postarrest statements should have been suppressed, the majority concludes that the police had probable cause to arrest defendant and it was therefore proper for the trial court to admit defendant's custodial statements. This conclusion differs from that of the appellate court below, which held that the

police lacked probable cause to arrest defendant but the admission of defendant's postarrest statements was harmless error. 349 Ill. App. 3d 845, 851. I disagree with the majority's conclusion. In my view, the appellate court's disposition regarding this issue was correct.

In order to effect a valid, warrantless arrest, a police officer must have probable cause to arrest. *People v. Sims*, 192 Ill. 2d 592, 614 (2000). "Probable cause exists when the totality of the facts and circumstances known to the officers is such that a reasonably prudent person would believe that the suspect is committing or has committed a crime." *People v. Montgomery*, 112 Ill. 2d 517, 525 (1986), citing *Dunaway v. New York*, 442 U.S. 200, 208 n.9, 60 L. Ed. 2d 824, 833 n.9, 99 S. Ct. 2248, 2254 n.9 (1979); *Beck v. Ohio*, 379 U.S. 89, 91, 13 L. Ed. 2d 142, 145, 85 S. Ct. 223, 225 (1964); *People v. Tisler*, 103 Ill. 2d 226, 237 (1984). "Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person." *Ybarra v. Illinois*, 444 U.S. 85, 91, 62 L. Ed. 2d 238, 245, 100 S. Ct. 338, 342 (1979). Moreover, the determination as to whether there was probable cause to arrest is based on facts known to the police at the time the arrest was made. *People v. Lee*, 214 Ill. 2d 476, 484 (2005), citing *People v. Chapman*, 194 Ill. 2d 186, 217 (2000). "A warrantless arrest cannot be justified by what is found during a subsequent search incident to the arrest." *Lee*, 214 Ill. 2d at 484. "Mere suspicion is inadequate to establish probable cause to arrest, but the evidence relied upon by the arresting officers does not have to be sufficient to prove guilt beyond a reasonable doubt." *Sims*, 192 Ill. 2d at 614-15.

In the case at bar, the events leading up to defendant's arrest were as follows. Officer Henninger of the Franklin Park police department, the sole witness at the hearing on defendant's motion to suppress his custodial statements, testified that he received a call from dispatch sometime prior to 4:45 a.m. on December 29, 2001. The call indicated that Gerhardt Roth, who was at an Amoco gas station, reported that there was a van at the gas station with license plates that had been stolen from one of his company's vans. When Officer Henninger arrived at the gas station, he noticed a white van with a CompUSA logo on the side, and a white passenger vehicle parked near the van. One of defendant's codefendants, Lewis Taylor, was in the passenger vehicle, and defendant and the other codefendant, Michael Bennett, were in the gas station's minimart. Officer

Henninger was approached by Roth, whose company was T&T Express, a shipping concern in the area. Roth told Officer Henninger that he had seen the CompUSA van and the white vehicle at his company earlier that morning, and he noticed that the license plate on the van had been stolen from one of his company's vehicles. When the CompUSA van and the white vehicle left T&T Express, Roth said he followed them. Both the van and the white vehicle pulled into the Amoco gas station, as did Roth before he called the police. At the gas station, Roth told Officer Henninger that he saw three individuals (identified in court by Officer Henninger as defendant and his two codefendants) either "in or around" the van. Officer Henninger testified that he could not recall whether Roth knew exactly which of the individuals had been inside the van.

A computer check on the van's license plates indicated that they were stolen. Officer Henninger also ran a computer check on the van's vehicle identification number and discovered that the van was stolen, as well. According to the testimony at the hearing, the two individuals who were in the minimart (defendant and Bennett) emerged at some point and approached Officer Henninger. While he was speaking to the two men, Officer Henninger received a radio message that police in Bensenville, about two miles away, were looking for a white CompUSA van and a white vehicle that may have been involved in a theft from Emery Worldwide. Officer Henninger also did a computer check on the three codefendants and discovered that Taylor was wanted on an outstanding warrant for driving with a suspended license. Officer Henninger arrested Taylor. According to Officer Henninger's testimony, he also arrested defendant.

At the time of defendant's arrest, the police were aware that: (1) the license plates on the white CompUSA van were stolen, (2) the van itself was stolen, and (3) police in Bensenville were looking for a white CompUSA van and a white vehicle (possibly the vehicle that was parked near the CompUSA van at the gas station) in connection with a possible theft from Emery Worldwide. In addition, police were told by Roth at the gas station that he saw defendant and two other individuals "in or around" the CompUSA van. Police also knew, prior to defendant's arrest, that Taylor, one of the codefendants, was wanted on an outstanding warrant for an unrelated offense.

While the facts and circumstances known to the police at the time of defendant's arrest were such that a reasonably prudent person would believe that a crime or crimes had been or were being committed, there was nothing to support a reasonable belief that *defendant* committed these or any other crimes. The only evidence linking defendant to a crime was Roth's statement that he had seen defendant and two other individuals "in or around" the CompUSA van. As the appellate court below asserted:

> "This sole fact did not warrant the defendant's arrest. The defendant could have been in or around the van for any number of lawful reasons." 349 Ill. App. 3d at 851.

The appellate court explained:

> "The fact that the defendant was in or around the van warranted reasonable suspicion, a standard less than probable cause, which would have entitled the police to question the defendant and investigate the situation further. Instead of doing so, however, the police simply arrested the defendant." 349 Ill. App. 3d at 851.

In the appellate court's view, the police lacked probable cause to arrest defendant. Accordingly, "the trial court should have suppressed any harmful statements made by the defendant subsequent to his arrest." 349 Ill. App. 3d at 851. I agree with the appellate court's reasoning, which finds support in a recent decision of this court.

In *People v. Lee*, 214 Ill. 2d 476 (2005), the defendant was one of three men arrested for violating Joliet's drug-loitering ordinance. Police officers were dispatched to an intersection in an area that the city had designated "high-drug" and "high-gang." The officers were sent to investigate a citizen complaint of three men selling drugs on the corner. The officers arrived at the intersection and saw the defendant and two other men standing on the corner. One of the officers knew that the defendant had previously been arrested for drug possession, and that one of the other two men was a member of a street gang. *Lee*, 214 Ill. 2d at 478-79. The officers parked about two blocks away and observed the men for about three to five minutes. The officers saw a van pull up to the curb and park, saw the three men speak to the driver, and saw the van drive away. The officers did not see an exchange of money or drugs. However, they believed that a drug transaction had taken place or was about to take

˘19˘

place. When the van drove away, the officers approached the three men. A protective pat-down search disclosed no weapons or contraband. Nevertheless, the officers arrested defendant and the other two men for violating Joliet's drug-loitering ordinance. A search incident to the arrest revealed cocaine in the defendant's pocket. The defendant was charged with and convicted of drug possession offenses. *Lee*, 214 Ill. 2d at 478-81.

This court held that the officers lacked probable cause to arrest the defendant for violating the drug-loitering ordinance. Consequently, this court reversed the defendant's drug-possession convictions. The defendant stood on a corner with two other men. He did not make any hand gestures or place anything in his mouth or pockets. The officers observed a van pull to the curb where the defendant and the other two men were standing, but none of the three men had summoned the van. "For all the officers knew, the driver of the van might have stopped and asked for directions, or to greet one or more acquaintances." *Lee*, 214 Ill. 2d at 486. The van then drove away. The officers did not see a drug transaction. This court concluded: "[T]he fact, by itself, that the officers found defendant in a certain area, without any overt act by defendant, does not establish probable cause for a warrantless arrest." *Lee*, 214 Ill. 2d at 486. In this court's view, the facts available to the officers supported a reasonable *suspicion* that warranted further investigation. However, the officers did not conduct any further investigation to raise their reasonable suspicion to the level of probable cause for a warrantless arrest. Instead, the police arrested the defendant, and this court reversed his convictions, concluding that the arrest was improper. *Lee*, 214 Ill. 2d at 487-89.

In the case at bar, the police knew that a crime had been committed. However, the question was whether defendant, in particular, had committed or was committing a crime. The police had enough information to justify a reasonable suspicion, but did not have enough information to support probable cause to arrest. As in *Lee*, the police could have questioned defendant and investigated the situation further. However, the police instead arrested defendant prematurely, without probable cause.

My colleagues in the majority assert that "there was far more evidence" linking defendant to the stolen license plates than Roth's

isolated statement that he had observed defendant in or around a van bearing those plates. Slip op. at 5. However, the evidence recounted by the majority is essentially the same as the evidence that was recounted by the appellate court below. And, as the appellate court concluded, there is nothing in this evidence, other than the statement that defendant was seen "in or around" the van, that would suggest a possible link between defendant and the commission of a crime.

Notwithstanding the foregoing, the majority infers that defendant and his codefendants "were connected with one another" and, based in part on this inference of a connection, the majority concludes that defendant was involved in the theft of the license plate. The majority reasons as follows:

> "[L]ogic dictates that at least two persons had to have been involved in the theft at Roth's company to have been able to drive both the van and the white car that followed it. There was no evidence the van or the car stopped anywhere to drop off any passengers or to pick up additional ones between leaving Roth's company property and parking at the gas station. Thus, logically, the same individuals were in the van and the car when the vehicles left Roth's company property and when they parked at the gas station. Moreover, Officer Henninger did not recall seeing any other customers at the gas station.

> One man was observed in the white car parked near the van at the gas station. Defendant was one of two other men who together came out of the convenience store and approached Officer Henninger. Roth identified defendant as one of the men he had previously seen in or around the van. Based on these facts, it was reasonable to infer that the three men were connected with one another and had been personally observed by the eyewitness and identified as the same men who had been in or around the van bearing the stolen license plate. Based on this connection, the brief time that had passed since the theft of the license plate, and the implausibility that anyone had left or entered the vehicles between their departure from Roth's property and their arrival at the gas station, it was reasonable to conclude defendant was involved in that crime." Slip op. at 5-6.

˘21˘

I note, initially, that, while it might be logical to infer that at least two persons were involved in the theft of the license plate, it does not necessarily follow that *more* than two were involved. There was nothing in the evidence available to the police at the time of defendant's arrest to indicate that it was defendant and a codefendant, rather than the other two codefendants, who were involved in the theft. More important, even if it is assumed, *arguendo*, that there were grounds to infer a connection between the three defendants, such an inference is insufficient to support probable cause. The requirement that probable cause must be particularized with respect to the person arrested cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to arrest another individual who is in the company of that person. *Ybarra v. Illinois*, 444 U.S. 85, 91, 62 L. Ed. 2d 238, 245, 100 S. Ct. 338, 342 (1979); *Lee*, 214 Ill. 2d at 486; see also *United States v. Di Re*, 332 U.S. 581, 592-94, 92 L. Ed. 210, 219-20, 68 S. Ct. 222, 227-28 (1948) (holding that the presence of the defendant in an automobile with a suspected criminal and a government informant did not supply a law enforcement officer with probable cause to arrest the defendant on a conspiracy theory). In the case at bar, an inference of a connection between defendant and the other two codefendants might have supported a reasonable suspicion, but it was insufficient to furnish probable cause for a warrantless arrest. Accordingly, the police lacked probable cause to arrest defendant, and the trial court should have granted defendant's motion to suppress his postarrest inculpatory statements.

While I would hold that defendant's custodial statements should have been suppressed, I would also hold, as did the appellate court, that the admission of these statements was harmless beyond a reasonable doubt. " '[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.' " *Harrington v. California*, 395 U.S. 250, 251, 23 L. Ed. 2d 284, 286, 89 S. Ct. 1726, 1727 (1969), quoting *Chapman v. California*, 386 U.S. 18, 24, 17 L. Ed. 2d 705, 710-11, 87 S. Ct. 824, 828 (1967). In determining whether a constitutional error is harmless, the test to be applied is whether it appears beyond a reasonable doubt that the error at issue did not contribute to the verdict obtained. *Sullivan v. Louisiana*, 508 U.S. 275, 279, 124 L. Ed. 2d 182, 189, 113 S. Ct. 2078, 2081 (1993).

After reviewing the record in the case at bar, the appellate court concluded that defendant's postarrest statements–his request that his wallet be retrieved from the van and his admission that he was in the area of Emery Worldwide on the morning in question–were not material to the trial court's guilty finding. 349 Ill. App. 3d at 852. The appellate court pointed to the following evidence, which the court held was admissible and "would not have been subject to exclusion as fruit of the poisonous tree." 349 Ill. App. 3d at 852. In the early morning of December 29, 2001, an employee of Emery Worldwide in Bensenville observed a white CompUSA van and a white passenger vehicle near Emery Worldwide's loading dock. Computer equipment was being stored in that area in a tractor trailer. Subsequently, police found a white CompUSA van and a white passenger vehicle in a gas station parking lot in nearby Franklin Park. Police determined that the van was stolen. Defendant and his two codefendants were seen in the vicinity of the stolen van. Police inventoried the contents of the van and found $40,000 worth of computer equipment belonging to Emery Worldwide. Also found in the van were a wallet stipulated by defendant to be his, an article of clothing belonging to one of the codefendants, and hand-held, two-way radios. Police found a matching hand-held radio in the white passenger vehicle.

With regard to the wallet found in the van, the record contains the following stipulated fact: Franklin Park police "found in the white COMP U.S.A. van the Defendant's wallet." This fact is independent of defendant's custodial request that his wallet be retrieved from the van.

In view of the evidence recounted by the appellate court, which excludes defendant's postarrest inculpatory statements, I agree with the appellate court that the improper admission of these custodial statements did not contribute to defendant's conviction. The appellate court correctly concluded that the admission of defendant's postarrest statements was harmless beyond a reasonable doubt.

Accordingly, I concur in the majority's affirmance of the appellate court's judgment. However, I disagree with the reasoning employed by the majority in reaching this decision.

I also concur in the majority's decision upholding the constitutionality of section 5–4–3 of the Unified Code of Corrections (730 ILCS 5/5–4–3 (West 2002)). The majority applies both the

special needs test and the balancing test, and demonstrates correctly that section 5‒4‒3 is constitutional under either analysis.

JUSTICE FREEMAN joins in this special concurrence.